Justice Scalia
delivered the opinion of the Court, except as to Part II-D-2.
We consider whether a defendant forfeits his Sixth Amendment right to confront a witness against him when a judge determines that a wrongful act by the defendant made the witness unavailable to testify at trial.
*356 I
On September 29, 2002, petitioner Dwayne Giles shot his ex-girlfriend, Brenda Avie, outside the garage of his grandmother’s house. No witness saw the shooting, but Giles’ niece heard what transpired from inside the house. She heard Giles and Avie speaking in conversational tones. Avie then yelled “Granny” several times and a series of gunshots sounded. Giles’ niece and grandmother ran outside and saw Giles standing near Avie with a gun in his hand. Avie, who had not been carrying a weapon, had been shot six times. One wound was consistent with Avie’s holding her hand up at the time she was shot, another was consistent with her having turned to her side, and a third was consistent with her having been shot while lying on the ground. Giles fled the scene after the shooting. He was apprehended by police about two weeks later and charged with murder.
At trial, Giles testified that he had acted in self-defense. Giles described Avie as jealous, and said he knew that she had once shot a man, that he had seen her threaten people with a knife, and that she had vandalized his home and car on prior occasions. He said that on the day of the shooting, Avie came to his grandmother’s house and threatened to kill him and his new girlfriend, who had been at the house earlier. He said that Avie had also threatened to kill his new girlfriend when Giles and Avie spoke on the phone earlier that day. Giles testified that after Avie threatened him at the house, he went into the garage and retrieved a gun, took the safety off, and started walking toward the back door of the house. He said that Avie charged at him, and that he was afraid she had something in her hand. According to Giles, he closed his eyes and fired several shots, but did not intend to kill Avie.
Prosecutors sought to introduce statements that Avie had made to a police officer responding to a domestic-violence report about three weeks before the shooting. Avie, who was crying when she spoke, told the officer that Giles had *357 accused her of having an affair, and that after the two began to argue, Giles grabbed her by the shirt, lifted her off the floor, and began to choke her. According to Avie, when she broke free and fell to the floor, Giles punched her in the face and head, and after she broke free again, he opened a folding knife, held it about three feet away from her, and threatened to kill her if he found her cheating on him. Over Giles’ objection, the trial court admitted these statements into evidence under a provision of California law that permits admission of out-of-court statements describing the infliction or threat of physical injury on a declarant when the declarant is unavailable to testify at trial and the prior statements are deemed trustworthy. Cal. Evid. Code Ann. § 1370 (West Supp. 2008).
A jury convicted Giles of first-degree murder. He appealed. While his appeal was pending, this Court decided in Crawford v. Washington, 541 U. S. 36, 53-54 (2004), that the Confrontation Clause requires that a defendant have the opportunity to confront the witnesses who give testimony against him, except in cases where an exception to the confrontation right was recognized at the time of the founding. The California Court of Appeal held that the admission of Avie’s unconfronted statements at Giles’ trial did not violate the Confrontation Clause as construed by Crawford because Crawford recognized a doctrine of forfeiture by wrongdoing. 19 Cal. Rptr. 3d 843, 847 (2004) (officially depublished). It concluded that Giles had forfeited his right to confront Avie because he had committed the murder for which he was on trial, and because his intentional criminal act made Avie unavailable to testify. The California Supreme Court affirmed on the same ground. 40 Cal. 4th 833, 837, 152 P. 3d 433, 435 (2007). We granted certiorari. 552 U. S. 1136 (2008).
II
The Sixth Amendment provides that “[i]n all criminal prosecutions, the accused shall enjoy the right... to be con *358 fronted with the witnesses against him.” The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him. Crawford, 541 U. S., at 68. The State does not dispute here, and we accept without deciding, that Avie’s statements accusing Giles of assault were testimonial. But it maintains (as did the California Supreme Court) that the Sixth Amendment did not prohibit prosecutors from introducing the statements because an exception to the confrontation guarantee permits the use of a witness’s unconfronted testimony if a judge finds, as the judge did in this ease, that the defendant committed a wrongful act that rendered the witness unavailable to testify at trial. We held in Crawford that the Confrontation Clause is “most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.” Id., at 54. We therefore ask whether the theory of forfeiture by wrongdoing accepted by the California Supreme Court is a founding-era exception to the confrontation right.
A
We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. See id., at 56, n. 6, 62. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. See, e. g., King v. Woodcock, 1 Leach 500, 501-504, 168 Eng. Rep. 352, 353-354 (1789); State v. Moody, 3 N. C. 31 (Super. L. & Eq. 1798); United States v. Veitch, 28 F. Cas. 367, 367-368 (No. 16,614) (CC DC 1803); King v. Commonwealth, 4 Va. 78, 80-81 (Gen. Ct. 1817). Avie did not make the unconfronted statements admitted at Giles’ trial when she was *359 dying, so her statements do not fall within this historic exception.
A second common-law doctrine, which we will refer to as forfeiture by wrongdoing, permitted the introduction of statements of a witness who was “detained” or “kept away” by the “means or procurement” of the defendant. See, e. g., Lord Motley’s Case, 6 How. St. Tr. 769, 771 (H. L. 1666) (“detained”); Harrison’s Case, 12 How. St. Tr. 833, 851 (H. L. 1692) (“made him keep away”); Queen v. Scaife, 117 Q. B. 238, 242, 117 Eng. Rep. 1271, 1273 (Q. B. 1851) (“kept away”); see also 2 W. Hawkins, Pleas of the Crown 425 (4th ed. 1762) (hereinafter Hawkins) (same); T. Peake, Compendium of the Law of Evidence 62 (2d ed. 1804) (“sent” away); 1 G. Gilbert, Law of Evidence 214 (1791) (“detained and kept back from
appearing by the means and procurement of the prisoner”). The doctrine has roots in the 1666 decision in Lord Motley’s Case, at which judges concluded that a witness’s having been “detained by the means or procurement of the prisoner” provided a basis to read testimony previously given at a coroner’s inquest. 6 How. St. Tr., at 770-771. Courts and commentators also concluded that wrongful procurement of a witness’s absence was among the grounds for admission of statements made at bail and committal hearings conducted under the Marian statutes, which directed justices of the peace to take the statements of felony suspects and the persons bringing the suspects before the magistrate, and to certify those statements to the court, Crawford, supra, at 43-44; J. Langbein, Prosecuting Crime in the Renaissance 10-12, 16-20 (1974). See 2 Hawkins 429. This class of confronted statements was also admissible if the witness who made them was dead or unable to travel. Ibid.
The terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct designed to prevent the witness from testifying. The rule required the witness to have been *360 “kept back” or “detained” by “means or procurement” of the defendant. Although there are definitions of “procure” and “procurement” that would merely require that a defendant have caused the witness’s absence, other definitions would limit the causality to one that was designed to bring about the result “procured.” See 2 N. Webster, An American Dictionary of the English Language (1828) (defining “procure” as “to contrive and effect” (emphasis added)); ibid, (defining “procure” as “[t]o get; to gain; to obtain; as by request, loan, effort, labor or purchase”); 12 Oxford English Dictionary 559 (2d ed. 1989) (def. 1(3)) (defining “procure” as “[t]o contrive or devise with care (an action or proceeding); to endeavour to cause or bring about (mostly something evil) to or for a person”). Similarly, while the term “means” could sweep in all cases in which a defendant caused a witness to fail to appear, it can also connote that a defendant forfeits confrontation rights when he uses an intermediary for the purpose of making a witness absent. See 9 id., at 516 (“[A] person who intercedes for another or uses influence in order to bring about a desired result”); N. Webster, An American Dictionary of the English Language 822 (1869) (“That through which, or by the help of which, an end is attained”).
Cases and treatises of the time indicate that a purpose-based definition of these terms governed. A number of them said that prior testimony was admissible when a witness was kept away by the defendant’s “means and contrivance.” See 1 J. Chitty, A Practical Treatise on the Criminal Law 81 (1816) (“kept away by the means and contrivance of the prisoner”); S. Phillipps, A Treatise on the Law of Evidence 165 (1814) (“kept out of the way by the means and contrivance of the prisoner”); Drayton v. Wells, 10 S. C. L. 409, 411 (S. C. 1819) (“kept away by the contrivance of the opposite party”). This phrase requires that the defendant have schemed to bring about the absence from trial that he “contrived.” Contrivance is commonly defined as the act of “inventing, devising or planning,” 1 Webster, supra, at 47 *361 (1828), “ingeniously endeavouring' the accomplishment of anything,” “the bringing to pass by planning, scheming, or stratagem,” or “[a]daption of means to an end; design, intention,” 3 Oxford English Dictionary, supra, at 850.[1]
An 1858 treatise made the purpose requirement more explicit still, stating that the forfeiture rule applied when a witness “had been kept out of the way by the prisoner, or by some one on the prisoner’s behalf, in order to prevent him from giving evidence against him” E. Powell, The Practice of the Law of Evidence 166 (1858) (emphasis added). The wrongful-procurement exception was invoked in a manner consistent with this definition. We are aware of no case in which the exception was invoked although the defendant had not engaged in conduct designed to prevent a witness from testifying, such as offering a bribe.
B
The manner in which the rule was applied makes plain that unconfronted testimony would not be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying — as in the typical murder case involving accusatorial statements by the victim — the testimony was excluded unless it was confronted or *362 fell within the dying-declarations exception. Prosecutors do not appear to have even argued that the judge could admit the unconfronted statements because the defendant committed the murder for which he was on trial.
Consider King v. Woodcock. William Woodcock was accused of killing his wife Silvia, who had been beaten and left near death. A Magistrate took Silvia Woodcock’s account of the crime, under oath, and she died about 48 hours later. The judge stated that “[g]reat as a crime of this nature must always appear to be, yet the inquiry into it must proceed upon the rules of evidence.” 1 Leach, at 500, 168 Eng. Rep., at 352. Aside from testimony given at trial in the presence of the prisoner, the judge said, there were “two other species which are admitted by law: The one is the dying declaration of a person who has received a fatal blow; the other is the examination of a prisoner, and the depositions of the witnesses who may be produced against him” taken under the Marian bail and committal statutes. Id., at 501, 168 Eng. Rep., at 352-353 (footnote omitted). Silvia Woodcock’s statement could not be admitted pursuant to the Marian statutes because it was unconfronted — the defendant had not been brought before the examining Magistrate and “the prisoner therefore had no opportunity of contradicting the facts it contains.” Id., at 502, 168 Eng. Rep., at 353. Thus, the statements were admissible only if the witness “apprehended that she was in such a state of mortality as would inevitably oblige her soon to answer before her Maker for the truth or falsehood of her assertions.” Id., at 503, 168 Eng. Rep., at 353-354 (footnote omitted). Depending on the account one credits, the court either instructed the jury to consider the statements only if Woodcock was “in fact under the apprehension of death,” id., at 504,168 Eng. Rep., at 354, or determined for itself that Woodcock was “quietly resigned and submitting to her fate” and admitted her statements into evidence, 1 E. East, Pleas of the Crown 356 (1803).
*363 King v. Dingier, 2 Leach 561, 168 Eng. Rep. 383 (1791), applied the same test to exclude unconfronted statements by a murder victim. George Dingier was charged with killing his wife Jane, who suffered multiple stab wounds that left her in the hospital for 12 days before she died. The day after the stabbing, a Magistrate took Jane Dingier’s deposition — as in Woodcock, under oath — “of the facts and circumstances which had attended the outrage committed upon her.” 2 Leach, at 561, 168 Eng. Rep., at 383. George Dingier’s attorney argued that the statements did not qualify as dying declarations and were not admissible Marian examinations because they were not taken in the presence of the prisoner, with the result that the defendant did not “have, as he is entitled to have, the benefit of cross-examination.” Id., at 562, 168 Eng. Rep., at 384. The prosecutor agreed, but argued the deposition should still be admitted because “it was the best evidence that the nature of the case would afford.” Id., at 563, 168 Eng. Rep., at 384. Relying on Woodcock, the court “refused to receive the examination into evidence.” 2 Leach, at 563, 168 Eng. Rep., at 384.
Many other cases excluded victims’ statements when there was insufficient evidence that the witness was aware he was about to die. See Thomas John’s Case, 1 East 357, 358 (P. C. 1790); Welbourn’s Case, 1 East 358, 360 (P. C. 1792); United States v. Woods, 28 F. Cas. 762, 763 (No. 16,760) (CC DC 1834); Lewis v. State, 17 Miss. 115, 120 (1847); Montgomery v. State, 11 Ohio 424, 425-426 (1842); Nelson v. State, 26 Tenn. 542, 543 (1847); Smith v. State, 28 Tenn. 9, 23 (1848). Courts in all these cases did not even consider admitting the statements on the ground that the defendant’s crime was to blame for the witness’s absence — even when the evidence establishing that was overwhelming. The reporter in Woodcock went out of his way to comment on the strength of the case against the defendant: “The evidence, independent of the information or declarations of the deceased, was *364 of a very pressing and urgent nature against the prisoner.” 1 Leach, at 501, 168 Eng. Rep., at 352.
Similarly, in Smith v. State, supra, the evidence that the defendant had caused the victim’s death included, but was not limited to, the defendant’s having obtained arsenic from a local doctor a few days before his wife became violently ill; the defendant’s paramour testifying at trial that the defendant admitted to poisoning his wife; the defendant’s having asked a physician “whether the presence of arsenic could be discovered in the human stomach a month after death”; and, the answer to that inquiry apparently not having been satisfactory, the defendant’s having tried to hire a person to burn down the building containing his wife’s body. Id., at 10-11. If the State’s reading of common law were correct, the dying declarations in these cases and others like them would have been admissible.
Judges and prosecutors also failed to invoke forfeiture as a sufficient basis to admit unconfronted statements in the cases that did apply the dying-declarations exception. This failure, too, is striking. At a murder trial, presenting evidence that the defendant was responsible for the victim’s death would have been no more difficult than putting on the government’s case in chief. Yet prosecutors did not attempt to obtain admission of dying declarations on wrongful-procurement-of-absence grounds before going to the often considerable trouble of putting on evidence to show that the crime victim had not believed he could recover. See, e. g., King v. Commonwealth, 4 Va., at 80-81 (three witnesses called to testify on the point); Gibson v. Commonwealth, 4 Va. Ill, 116-117 (Gen. Ct. 1817) (testimony elicited from doctor and witness); Anthony v. State, 19 Tenn. 265, 278-279 (1838) (doctor questioned about expected fatality of victim’s wound and about victim’s demeanor).
The State offers another explanation for the above cases. It argues that when a defendant committed some act of wrongdoing that rendered a witness unavailable, he forfeited *365 his right to object to the witness’s testimony on confrontation grounds, but not on hearsay grounds. See Brief for Respondent 23-24. No case or treatise that we have found, however, suggested that a defendant who committed wrongdoing forfeited his confrontation rights but not his hearsay rights. And the distinction would have been a surprising one, because courts prior to the founding excluded hearsay evidence in large part because it was unconfronted. See, e.g., 2 Hawkins 606 (6th ed. 1787); 2 M. Bacon, A New Abridgment of the Law 313 (1736). As the plurality said in Dutton v. Evans, 400 U. S. 74, 86 (1970), “[i]t seems apparent that the Sixth Amendment’s Confrontation Clause and the evidentiary hearsay rule stem from the same roots.”
The State and the dissent note that common-law authorities justified the wrongful-procurement rule by invoking the maxim that a defendant should not be permitted to benefit from his own wrong. See, e. g., G. Gilbert, Law of Evidence 140-141 (1756) (if a witness was “detained and kept back from appearing by the means and procurement” testimony would be read because a defendant “shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong”). But as the evidence amply shows, the “wrong” and the “evil Practices” to which these statements referred was conduct designed to prevent a witness from testifying. The absence of a forfeiture rule covering this sort of conduct would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them. There is nothing mysterious about courts’ refusal to carry the rationale further. The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior judicial assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury. It is akin, one might say, to “dispensing with jury trial because a defendant is obviously guilty.” Crawford, 541 U. S., at 62.
*366 c
Not only was the State’s proposed exception to the right of confrontation plainly not an “exceptio[n] established at the time of the founding,” id., at 54; it is not established in American jurisprudence since the founding. American courts never—prior to 1985—invoked forfeiture outside the context of deliberate witness tampering.
This Court first addressed forfeiture in Reynolds v. United States, 98 U. S. 145 (1879), where, after hearing testimony that suggested the defendant had kept his wife away from home so that she could not be subpoenaed to testify, the trial court permitted the Government to introduce testimony of the defendant’s wife from the defendant’s prior trial. See id., at 148-150. On appeal, the Court held that admission of the statements did not violate the right of the defendant to confront witnesses at trial, because when a witness is absent by the defendant’s “wrongful procurement,” the defendant “is in no condition to assert that his constitutional rights have been violated” if “their evidence is supplied in some lawful way.” Id., at 158. Reynolds invoked broad forfeiture principles to explain its holding. The decision stated, for example, that “[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts,” ibid., and that the wrongful-procurement rule “has its foundation” in the principle that no one should be permitted to take advantage of his wrong, and is “the outgrowth of a maxim based on the principles of common honesty,” id., at 159.
Reynolds relied on these maxims (as the common-law authorities had done) to be sure. But it relied on them (as the common-law authorities had done) to admit prior testimony in a case where the defendant had engaged in wrongful conduct designed to prevent a witness’s testimony. The Court’s opinion indicated that it was adopting the common-law rule. It cited leading common-law cases—Lord Motley's Case, *367 Harrison’s Case, and Scaife—described itself as “content with” the “long-established usage” of the forfeiture principle, and admitted prior confronted statements under circumstances where admissibility was open to no doubt under Lord Morley’s Case. Reynolds, supra, at 158-159.
If the State’s rule had a historical pedigree in the common law or even in the 1879 decision in Reynolds, one would have expected it to be routinely invoked in murder prosecutions like the one here, in which the victim’s prior statements inculpated the defendant. It was never invoked in this way. The earliest case identified by the litigants and amici curiae which admitted unconfronted statements on a forfeiture theory without evidence that the defendant had acted with the purpose of preventing the witness from testifying was decided in 1985. United States v. Rouco, 765 F. 2d 983 (CA11).
In 1997, this Court approved a Federal Rule of Evidence, entitled “Forfeiture by wrongdoing,” which applies only when the defendant “engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.” Fed. Rule Evid. 804(b)(6). We have described this as a rule “which codifies the forfeiture doctrine.” Davis v. Washington, 547 U. S. 813, 833 (2006). Every commentator we are aware of has concluded the requirement of intent “means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.” 5 C. Mueller & L. Kirkpatrick, Federal Evidence § 8:134, p. 235 (3d ed. 2007); 5 J. Weinstein & M. Berger, Weinstein’s Federal Evidence § 804.03[7][b], p. 804-32 (J. McLaughlin ed., 2d ed. 2008); 2 K. Broun, McCormick on Evidence 176 (6th ed. 2006).[2] The *368 commentators come out this way because the dissent’s claim that knowledge is sufficient to show intent is emphatically not the modern view. See 1 W. LaPave, Substantive Criminal Law § 5.2, p. 340 (2d ed. 2003).
In sum, our interpretation of the common-law forfeiture rule is supported by (1) the most natural reading of the language used at common law; (2) the absence of common-law cases admitting prior statements on a forfeiture theory when the defendant had not engaged in conduct designed to prevent a witness from testifying; (3) the common law’s uniform exclusion of unconfronted inculpatory testimony by murder victims (except testimony given with awareness of impending death) in the innumerable cases in which the defendant was on trial for killing the victim, but was not shown to have done so for the purpose of preventing testimony; (4) a subsequent history in which the dissent’s broad forfeiture theory has not been applied. The first two and the last are highly persuasive; the third is in our view conclusive.
*369 D
1
The dissent evades the force of that third point by claiming that no testimony would come in at common law based on a forfeiture theory unless it was confronted. It explains the exclusion of murder victims’ testimony by arguing that wrongful procurement was understood to be a basis for admission of Marian depositions — which the defendant would have had the opportunity to confront — but not for the admission of unconfronted testimony. See post, at 394.
That explanation is not supported by the cases. In Harrison’s Case, the leading English case finding wrongful procurement, the witness’s statements were admitted without regard to confrontation. An agent of the defendant had attempted to bribe a witness, who later disappeared under mysterious circumstances. The prosecutor contended that he had been “spirited, or withdrawn from us, by a gentleman that said he came to [the witness] from the prisoner, and desired him to be kind to the prisoner.” 12 How. St. Tr., at 851. The court allowed the witness’s prior statements before the coroner to be read, id., at 852, although there was no reason to think the defendant would have been present at the prior examination.[3]
*370 The reasoning of the common-law authorities reinforces the conclusion that the wrongful-procurement rule did not depend on prior confrontation. The judge in Harrison’s Case, after being told that “Mr. Harrison’s agents or friends have, since the last sessions, made or conveyed away a young man that was a principal evidence against him,” declared that if this were proved, “it will no way conduce to Mr. Harrison’s advantage.” Id., at 835-836. Similarly, a leading treatise’s justification of the use of statements from coroner’s inquests when a witness was “detained and kept back from appearing by the means and procurement” of the defendant was that the defendant “shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong.” G. Gilbert, Law of Evidence 141 (1756). But if the defendant could keep out unconfronted prior testimony of a wrongfully detained witness he would profit from “such evil Practices.”
While American courts understood the admissibility of statements made at prior proceedings (including coroner’s inquests like the one in Harrison’s Case) to turn on prior opportunity for cross-examination as a general matter, see Crawford, 541 U. S., at 47, n. 2, no such limit was applied or expressed in early wrongful-procurement eases. In Rex v. Barber, 1 Root 76 (Conn. Super. Ct. 1775), “[o]ne White, who had testified before the justice and before the grand-jury against Barber, and minutes taken of his testimony, was sent away by one Bullock, a friend of Barber’s, and by his instigation; so that he could not be had to testify before the petitjury. The court admitted witnesses to relate what White had before testified.” Two leading evidentiary treatises and a Delaware case reporter cite that case for the proposition *371 that grand jury statements were admitted on a wrongful-procurement theory. See Phillipps, Treatise on Evidence, at 200, n. (a); T. Peake, Compendium of the Law of Evidence 91, n. (m) (American ed. 1824); State v. Lewis, 1 Del. Cas. 608, 609, n. 1 (Ct. Quarter Sess. 1818). (Of course the standard practice since approximately the 17th century has been to conduct grand jury proceedings in secret, without confrontation, in part so that the defendant does not learn the State’s case in advance. S. Beale, W. Bryson, J. Felman, & M. Elston, Grand Jury Law and Practice § 5.2 (2d ed. 2005); see also 8 J. Wigmore, Evidence § 2360, pp. 728-735 (J. McNaughton rev. ed. 1961).)[4]
The Georgia Supreme Court’s articulation of the forfeiture rule similarly suggests that it understood forfeiture to be a basis for admitting unconfronted testimony. The court wrote that Lord Morley’s Case established that if a witness “who had been examined by the Crown, and was then absent, was detained by the means or procurement of the prisoner,” “then the examination should be read” into evidence. Williams v. State, 19 Ga. 402, 403 (1856). Its rule for all cases in which the witness “had been examined by the Crown” carried no confrontation limit, and indeed, the court adopted the rule from Lord Morley’s Case which involved not Marian examinations carrying a confrontation requirement, but coroner’s inquests that lacked one.
The leading American case on forfeiture of the confrontation right by wrongful procurement was our 1879 decision in Reynolds. That case does not set forth prior confrontation *372 as a requirement for the doctrine’s application, and begins its historical analysis with a full description of the rule set forth in Lord Motley’s Case, which itself contained no indication that the admitted testimony must have been previously confronted. It followed that description with a citation of Harrison’s Case—which, like Lord Motley’s Case, applied wrongful procurement to coroner’s inquests, not confronted Marian examinations—saying that the rule in those cases “seems to have been recognized as the law in England ever since.” 98 U. S., at 158. The opinion’s description of the forfeiture rule is likewise unconditioned by any requirement of prior confrontation:
“The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he kept away. . . . [The Constitution] grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.” Ibid.
There is no mention in this paragraph of a need for prior confrontation, even though if the Court believed such a limit applied, the phrase “their evidence is supplied” would more naturally have read “their previously confronted evidence is supplied.” Crawford reaffirmed this understanding by citing Reynolds for a forfeiture exception to the confrontation right. 541 U. S., at 54. And what Reynolds and Crawford described as the law became a seeming holding of this Court in Davis, which, after finding an absent witness’s unconfronted statements introduced at trial to have been testimo *373 nial, and after observing that “one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation,” 547 U. S., at 833, remanded with the instruction that “[t]he Indiana courts may (if they are asked) determine on remand whether ... a claim of forfeiture is properly raised and, if so, whether it is meritorious,” id., at 834.
Although the case law is sparse, in light of these decisions and the absence of even a single case declining to admit unconfronted statements of an absent witness on wrongful-procurement grounds when the defendant sought to prevent the witness from testifying, we are not persuaded to displace the understanding of our prior cases that wrongful procurement permits the admission of prior unconfronted testimony.
But the parsing of cases aside, the most obvious problem with the dissent’s theory that the forfeiture rule applied only to confronted testimony is that it amounts to self-immolation. If it were true, it would destroy not only our case for a narrow forfeiture rule, but the dissent’s case for a broader one as well. Prior confronted statements by witnesses who are unavailable are admissible whether or not the defendant was responsible for their unavailability. 541 U. S., at 68. If the forfeiture doctrine did not admit unconfronted prior testimony at common law, the conclusion must be, not that the forfeiture doctrine requires no specific intent in order to render unconfronted testimony available, but that unconfronted testimony is subject to no forfeiture doctrine at all.[5]
*374 2
Having destroyed its own case, the dissent issues a thinly veiled invitation to overrule Crawford and adopt an approach not much different from the regime of Ohio v. Roberts, 448 U. S. 56 (1980), under which the Court would create the exceptions that it thinks consistent with the policies underlying the confrontation guarantee, regardless of how that guarantee was historically understood. The “basic purposes and objectives” of forfeiture doctrine, it says, require that a defendant who wrongfully caused the absence of a witness be deprived of his confrontation rights, whether or not there was any such rule applicable at common law. Post, at 384.
If we were to reason from the “basic purposes and objectives” of the forfeiture doctrine, we are not at all sure we would come to the dissent’s favored result. The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in “the ability of courts to protect the integrity of their proceedings.” Davis, supra, at 834. The boundaries of the doctrine seem to us intelligently fixed so as to avoid a principle repugnant to our constitutional system of trial by jury: that those murder defendants whom the judge considers guilty (after less than a full trial, mind you, and of course before the jury has pronounced guilt) should be deprived of fair-trial rights, lest they benefit from their judge-determined wrong.[6]
*375 Since it is most certainly not the norm that trial rights can be “forfeited” on the basis of a prior judicial determination of guilt, the dissent must go far afield to argue even by analogy for its forfeiture rule. See post, at 384-385 (discussing common-law doctrine that prohibits the murderer from collecting insurance on the life of his victim, or an inheritance from the victim’s estate); post, at 386 (noting that many criminal statutes punish a defendant regardless of his purpose). These analogies support propositions of which we have no doubt: States may allocate property rights as they see fit, and a murderer can and should be punished, without regard to his purpose, after a fair trial. But a legislature may not “punish” a defendant for his evil acts by stripping him of the right to have his guilt in a criminal proceeding determined by a jury, and on the basis of evidence the Constitution deems reliable and admissible.
The larger problem with the dissent’s argument, however, is that the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider “fair.” It is not the role of courts to extrapolate from the words of the Sixth Amendment to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts’ views) those underlying values. The Sixth Amendment seeks fairness indeed — but seeks it through very specific means (one of which is confrontation) that were the trial rights of Englishmen. It “does *376 not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.” Crawford, 541 U. S., at 54.[7]
E
The dissent closes by pointing out that a forfeiture rule which ignores Crawford would be particularly helpful to women in abusive relationships — or at least particularly helpful in punishing their abusers. Not as helpful as the dissent suggests, since only testimonial statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent’s version of forfeiture by wrongdoing. In any event, we are puzzled by the dissent’s decision to devote its peroration to domestic-abuse cases. Is the suggestion that we should have one Confrontation Clause (the one the Framers adopted and Crawford described) for all other crimes, but a special, improvised, Confrontation Clause for those crimes that are frequently directed against women? Domestic violence is an intolerable offense that legislatures may choose to combat through many means — from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the State’s arsenal.
*377 The domestic-violence context is, however, relevant for a separate reason. Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution — rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify. This is not, as the dissent charges, post, at 404, nothing more than “knowledge-based intent.” (Emphasis deleted.)
The state courts in this case did not consider the intent of the defendant because they found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the court is free to consider evidence of the defendant’s intent on remand.
* * H=
We decline to approve an exception to the Confrontation Clause unheard of at the time of the founding or for 200 years thereafter. The judgment of the California Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

 The dissent asserts that a defendant could have “contrived, i. e., devised or planned ... to murder a victim” without the purpose of keeping the victim away from trial. See post, at 392 (opinion of Breyer, J.). But that would not be contriving to keep the witness away. The dissent further suggests that these authorities are irrelevant because “the relevant phrase” in Lord Morley’s Case itself is “ ‘by the means or procurement’ ” of the defendant and means “may, or may not, refer to an absence that the defendant desired, as compared to an absence that the defendant caused.” Post, at 392 (emphasis added). But the authorities we cited resolve this ambiguity in favor of purpose by substituting for the “means or procurement” of Lord Morley’s Case either “contrivance” or “means and contrivance.” (Emphasis added.)

 Only a single state evidentiary code appears to contain a forfeiture rule broader than our holding in this case (and in Crawford v. Washington, 541 U. S. 36 (2004)) allow. Seven of the twelve States that recognize wrongdoing as grounds for forfeiting objection to out-of-court statements duplicate the language of the federal forfeiture provision that requires *368 purpose, see Del. Rule Evid. 804(b)(6) (2001); Ky. Rule Evid. 804(b)(5) (2004); N. D. Rule Evid. 804(b)(6) (2007); Pa. Rule Evid. 804(b)(6) (2005); Vt. Rule Evid. 804(b)(6) (2004); see also Term. Rule Evid. 804(b)(6) (2003) (identical except that it excludes mention of acquiescence); Mich. Rule Evid. 804(b)(6) (2008) (substitutes “engaged in or encouraged” for “engaged or acquiesced in”). Two others require “purpose” by their terms. Ohio Rule Evid. 804(B)(6) (2008); Cal. Evid. Code Ann. § 1350 (West Supp. 2008). Two of the three remaining forfeiture provisions require the defendant to have “procured” the unavailability of a witness, Haw. Rule 804(b)(7) (2007); Md. Cts. & Jud. Proc. Code Ann. § 10-901 (Lexis 2006)— which, as we have discussed, is a term traditionally used in the forfeiture context to require intent. Maryland’s rule has thus been described as “requiring] that the judge must find that [the] wrongdoing or misconduct was undertaken with the intent of making the witness unavailable to testify.” 6A L. McLain, Maryland Evidence, State and Federal §804(6):1, p. 230 (West Supp. 2007-2008). These rules cast more than a little doubt on the dissent’s assertion that the historic forfeiture rule creates intolerable problems of proof. The lone forfeiture exception whose text reaches more broadly than the rule we adopt is an Oregon rule adopted in 2005. See 2005 Ore. Laws p. 1232, ch. 458 (S. B. 287).

 Wrongful procurement was also described as grounds for admitting uneonfronted testimony in Fenwick’s Case, 13 How. St. Tr. 537 (H. C. 1696), a parliamentary attainder proceeding. Although many speakers argued for admission of unconfronted testimony simply because Parliament was not bound by the rules of evidence for felony cases, see Crawford, supra, at 46, it was also argued that witness tampering could be a basis for admitting unconfronted statements even in common-law felony trials: “[W]here persons do stand upon their lives, accused for crimes, if it appears to the court that the prisoner hath, by fraudulent and indirect means, procured a person that hath given information against him to a proper magistrate, to withdraw himself, so that he cannot give evidence as regularly as they used to do; in that case his information hath been read; which, I suppose, with humble submission, is this case . . . ,” 13 How. St. Tr., at 594 (remarks of Lovel). The dissent responds that in most circumstances in *370 which a witness had given information against a defendant before “‘a proper magistrate,”’ the testimony would have been confronted. Post, at 399. Perhaps so, but the speaker was arguing that the wrongful-procurement exception applied in “this case”—Fenwick’s Case, in which the testimony was unconfronted, see 13 How. St. Tr., at 591-592.

 Three commentators writing more than a century after the Barber decision said, without explanation, that they understood the case to have admitted only confronted testimony at a preliminary examination. W. Best, Principles of the Law of Evidence 473, n. (e.) (American ed. 1883); J. Stephen, A Digest of the Law of Evidence 161 (1902); 2 J. Bishop, New Criminal Procedure § 1197, p. 1024 (2d ed. 1913). We know of no basis for that understanding. The report of the case does not limit the admitted testimony to statements that were confronted.

 The dissent attempts to reconcile its approach with Crawford by saying the wrongful-procurement cases used language “broad enough” to reach every case in which a defendant committed wrongful acts that caused the absence of a victim, and that there was therefore an “ ‘exception’ ” “ ‘established at the time of the founding,”’ post, at 383, reaching all such misconduct. But an exception to what? The dissent contends that it was not an exception to confrontation. Were that true, it would be the end of the Crawford inquiry.

 The dissent identifies one circumstance — and only one — in which a court may determine the outcome of a case before it goes to the jury: A judge may determine the existence of a conspiracy in order to make incriminating statements of co-conspirators admissible against the defendant under Federal Rule of Evidence 801(d)(2)(E). Bourjaily v. United States, 483 U. S. 171 (1987), held that admission of the evidence did not violate the Confrontation Clause because it “falls within a firmly rooted hearsay exception” — the test under Ohio v. Roberts, 448 U. S. 56, 66 (1980), the case that Crawford overruled. In fact it did not violate the Confrontation Clause for the quite different reason that it was not (as an incrimi *375 nating statement in furtherance of the conspiracy would probably never be) testimonial. The co-conspirator hearsay rule does not pertain to a constitutional right and is in fact quite unusual.
We do not say, of course, that a judge can never be allowed to inquire into guilt of the charged offense in order to make a preliminary evidentiary ruling. That must sometimes be done under the forfeiture rule that we adopt — when, for example, the defendant is on trial for murdering a witness in order to prevent his testimony. But the exception to ordinary practice that we support is (1) needed to protect the integrity of court proceedings, (2) based upon longstanding precedent, and (3) much less expansive than the exception proposed by the dissent.

 The dissent also implies that we should not adhere to Crawford because the confrontation guarantee limits the evidence a State may introduce without limiting the evidence a defendant may introduce. See post, at 388-389. That is true. Just as it is true that the State cannot decline to provide testimony harmful to its case or complain of the lack of a speedy trial. The asymmetrical nature of the Constitution’s criminal-trial guarantees is not an anomaly, but the intentional conferring of privileges designed to prevent criminal conviction of the innocent. The State is at no risk of that.