CORRIGAN, J.
(dissenting). I respectfully dissent. The Court of Appeals reasonably concluded that the victim’s statements — made within a half-hour of being shot while he lay bleeding in a parking lot — were non-testimonial for Confrontation Clause purposes because *158 they were elicited by police officers addressing an ongoing emergency. Further, I question the majority’s treatment of Crawford v Washington, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004), and Davis v Washington, 547 US 813; 126 S Ct 2266; 165 L Ed 2d 224 (2006), as conclusive regarding the admissibility of the victim’s statements under these facts, where, although the victim’s statements were likely also dying declarations, the prosecution abandoned this argument in the lower courts. The statements likely would have qualified for admission both as excited utterances and as dying declarations but, under then-existing law, the prosecution needed only to advocate for admission under one theory. It chose the former. After the trial, however, the United States Supreme Court established new Confrontation Clause standards in Crawford and further suggested that dying declarations might prove a rare exception to the new rule. The statements in this case seem admissible as dying declarations, thus potentially obviating much of the majority’s analysis. Accordingly, the majority’s opinion — which reverses a number of close calls made by the Court of Appeals in this highly fact-specific case — exemplifies the adage that “bad facts make bad law.” For these reasons, I would affirm defendant’s convictions.
As recounted in the majority opinion, police officers arrived at a Detroit gas station at 3:25 a.m. within minutes after receiving a report of a shooting. It appears that they did not know how long ago the shooting had occurred, where it took place, or whether the shooter was at the gas station. They found the gunshot victim lying on the ground, bleeding, visibly in pain, and having trouble talking. They asked him what happened. He reported that defendant shot him about 3:00 a.m. at a residence six blocks away. The majority concludes that *159 the primary purpose of the officers’ questions “was to establish the facts of an event that had already occurred,” not to “enable police assistance to meet an ongoing emergency.” Ante at 143. But the majority considers the facts in hindsight, rather than with an objective view of the circumstances at the time the statements were made. The United States Supreme Court’s opinion in Davis clearly establishes that the statements must be viewed through an objective assessment of the circumstances surrounding them: “Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Id. at 822 (emphasis added); and see Crawford, supra at 52 (emphasis added; citations omitted) (statements have been characterized as testimonial if they “ ‘were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial’ ”).
First, the majority assumes too much when it concludes that there was no ongoing emergency because the shooting necessarily occurred 30 minutes earlier. Rather, it is more likely that experienced officers would not take the victim’s time estimate so literally as to summarily conclude that they, the victim, and the public were out of danger. The officers themselves reported that the victim was visibly in pain and having trouble talking; I cannot imagine that they trusted him to have looked at his watch the moment after he was shot. Further, even at trial a precise time was never established; indeed, the victim’s brother testified that he heard shots between 3:00 and 3:30 a.m.
In any event, even if we assume that the reported shooting occurred a full 25 minutes earlier at 3:00 a.m., *160 this time lapse certainly does not prohibit as a matter of law the conclusion of the Court of Appeals that an emergency was ongoing. Rather, the officers knew that an armed assailant had been within six blocks of their location. They could not be sure that the assailant would not harm others or pursue the victim.[1] One could reasonably conclude that the assailant posed an immediate, continuing danger. Therefore, even if we assume that about 30 minutes had passed, this case does not become automatically comparable to cases such as Crawford, where police questioned the declarant at the police station “hours after” the relevant events occurred. See Davis, supra at 827.
Contrary to the majority’s assertions, ante at 149-150 n 15, Davis does not establish an artificial threshold after which all questions are assumed to be for purposes of retrospective investigation and all statements in response are presumed testimonial. The semantic difference between what is “actually happening” and what has already “happened” is not so simple when applied to the real world, where context controls which legal labels most aptly apply. The amount of time that has elapsed *161 between the onset of an emergency and statements about that emergency clearly must be considered in context.[2]
For similar reasons, I disagree with the majority’s presumption that the victim’s statements were not made during an ongoing emergency as a matter of law because the victim had escaped to the gas station. A mere distance in space between an initial event and the ensuing statements by a victim is not dispositive. Neither Davis nor Crawford states a bright-line rule establishing that an emergency ends the moment the assailant and victim are physically separated to any extent. Instead, clearly the nature of the initial assault, including the type of weapon used, affects whether an objective victim or police officer would conclude that the threat has ended, as I discuss further infra when I address the facts of Hammon, the companion case of Davis.[3] Indeed, as the majority acknowledges, ante at 146 n 12, there may have been an ongoing emergency originating from defendant’s house. There is no prin *162 cipled reason to conclude as a matter of law that the officers’ questions and the victim’s statements were unrelated to, or did not constitute a part of, that emergency merely on the basis of a distance of six blocks.[4]
For these reasons, I cannot join the majority’s conclusion that the victim’s statements “related solely to events that had occurred in the past. . . Ante at 143. Rather, as in Davis, supra at 827, “the nature of what was asked and answered ... was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn.. . what had happened in the past.” Accordingly, I also disagree with the majority’s comparison of this case to Hammon. There, the police spoke to the domestic violence victim while she sat on her front porch. She stated that the defendant had “hit” and “thrown” her. The defendant was inside the house. Davis, supra at 830. The Court reasonably determined that the victim was no longer in danger because she was protected by the police. Id. at 831. Further, because she suffered physical abuse but did not report that her assailant used a gun or that others were in danger inside the home, the prospect of continuing immediate danger to the victim, the officers, or the public was negligible. In contrast, the evidence here much more strongly suggests that an emergency was in progress and that the *163 officers sought to determine “ ‘what is happening,’ ” not simply “ ‘what happened.’ ” Id. at 830. Indeed, a gunman was on the loose. The officers did not know his location or whether he remained a threat. Thus, I cannot agree that the officers primarily questioned the victim “to investigate a past crime,” ante at 146, or to “establish or prove past events potentially relevant to later criminal prosecution,” Davis, supra at 822, as in Crawford and Hammon. Ante at 135, 147.
This case seems to fall midway on a spectrum between the facts of Crawford and those of Davis. As the Davis Court explained, in Davis the 911 caller “was speaking about events as they were actually happening, rather than ‘describing] past events.’ ” Davis, supra at 827 (emphasis and punctuation in original), quoting Lilly v Virginia, 527 US 116, 137; 119 S Ct 1887; 144 L Ed 2d 117 (1999) (plurality opinion). The call was “plainly a call for help against [a] bona fide physical threat,” and
the nature of what was asked and answered in Davis, again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past. That is true even of the operator’s effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Davis, supra at 827.]
In Crawford, in contrast, the declarant’s statements were made during questioning at the police station that took place “hours after the events she described had occurred.” Davis, supra at 827. The Davis Court also described the “striking” difference in the “level of formality between the two interviews.” Id. The declarant in Crawford was “responding calmly, at the station house, to a series of questions, with the officer- *164 interrogator taping and making notes other answers.” Id. The declarant in Davis, on the other hand, provided “frantic answers . . . over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.” Id.
I agree with the majority that this case is not precisely comparable to Davis because, here, the victim was not facing an immediate physical threat from an assailant, and the police had arrived on the scene. But this case is also by no means directly comparable to Crawford because, here, the shooting had just occurred, the statements were made only blocks away from the crime, the victim was in pain from untreated wounds that would soon prove to be fatal and was having trouble talking, and it was uncertain whether he, the police, or the public were out of physical danger. For these reasons, I conclude that this case is more similar to Davis than to Crawford. And, most significantly, to the extent this case’s location on the spectrum presents a close question, the Court of Appeals did not clearly err when it concluded that the emergency was ongoing and the victim’s statements were non-testimonial.
Finally, the majority’s decision is clouded by the prosecution’s abandonment of its original argument that the victim’s statements were dying declarations. The majority reasonably concludes that the prosecution abandoned this argument, which it raised only at the preliminary examination, by continuing to advance only its alternative theory that the victim’s statements were excited utterances.[5] This was a reasonable strat *165 egy at the time this trial took place. As the majority observes, before the United States Supreme Court issued Crawford, hearsay statements admissible under a “firmly rooted hearsay exception” — including “excited utterances” or “spontaneous declarations” — did not violate the Confrontation Clause. Ante at 151 n 17, citing Ohio v Roberts, 448 US 56, 66; 100 S Ct 2531; 65 L Ed 2d 597 (1980), and White v Illinois, 502 US 346, 355-356 n 8; 112 S Ct 736; 116 L Ed 2d 848 (1992). Crawford and Giles v California, _ US _; 128 S Ct 2678; 171 L Ed 2d 488 (2008), have subsequently suggested that dying declarations — but not some or all excited utterances — may remain admissible under Crawford, although unconfronted, because the dying declaration is an historical exception to hearsay rules that predated the Confrontation Clause. Giles, supra at _, 128 S Ct at 2682; Crawford, supra at 56 n 6, 58 n 8; and see the majority’s discussion ante at 142 n 6, 153 n 18. The victim’s statements here seem to qualify as dying declarations. He had been shot in the stomach at most 25 minutes before he spoke to the officers. He was lying on the ground, bleeding, in pain, and having trouble speaking. He had not yet received medical attention. He died a few hours later. Accordingly, his statements likely would have qualified as “statements] made by a declarant while believing that the declarant’s death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.” MRE 804(b). Although the prosecution chose *166 not to establish a circumstantial foundation for the applicability of MRE 804(b), opting instead to advance the equally useful argument that the statements were excited utterances, the prosecution may well have successfully done so had this trial occurred after the release of Crawford when the import of dying declarations as exceptions to the Confrontation Clause became apparent. Then, if dying declarations prove to be accepted as historical exceptions to the Confrontation Clause, we would have no reason to resolve the close question here concerning whether the victim’s statements were also made in the course of an ongoing emergency.
Therefore, I question the majority’s decision to rest its precedential analysis of Crawford and Davis on a fact-intensive Court of Appeals decision that does not even consider the legal argument that is arguably most relevant to the outcome of this case post-Crawford. Moreover, the majority acknowledges that defendant should not be faulted for failing to raise the Confrontation Clause issue at trial because Crawford had yet to be decided. Ante at 151 n 17. Yet it fails to give the same consideration to the prosecution, which had equally little reason to presume that its choice between two formerly equal theories for admission would become decisive on the basis of later-decided law. Even if the prosecution entirely abandoned its argument, why should we not give the parties the same consideration in light of the intervening changes in the law? At a minimum, I would not analyze the Confrontation Clause issue on the basis of the victim’s excited utterances under these facts; in my view, if the prosecution had not abandoned its attempt to classify the statements as dying declarations, we likely would not have to reach the contentious question whether there was also an ongoing emergency under Crawford and Davis.
*167 In conclusion, the Court of Appeals did not clearly err when it decided that the victim’s statements were admissible because they were non-testimonial under Crawford and Davis. Further, particularly because the appeals panel made reasonable, close calls in answering the fact-intensive questions presented, I would not reverse its decision where the statements were also likely dying declarations that would be excepted from the rule of Crawford. Accordingly, I would affirm.
YOUNG, J., concurred with CORRIGAN, J.

 The majority concludes that the officers did not subjectively perceive an ongoing emergency because they did not testify, for example, about “taking any actions to secure the area, to search the station for the possible presence of any armed individuals, or to provide cover for other officers.” See ante at 144-146. I am wary of the majority’s speculation concerning police procedures, particularly because these officers testified before the United States Supreme Court decided Crawford or Davis. Therefore, the officers were not questioned to elicit their goals in questioning the victim or whether and how they had already determined that the shooter was not in the immediate area. In any event, the majority’s reference to the officers’ later call for backup assistance, ante at 146, cuts against the majority’s conclusion; the officers’ fear that defendant remained armed and dangerous confirms that their attempts to identify him and his location by questioning the victim were related to potential ongoing danger.

 Further, the Court of Appeals conclusion that the emergency was ongoing here does not require us to conclude that an emergency is ongoing any time police seek to “apprehend a criminal before he might injure somebody else,” thereby “effectively render[ing] non-testimonial all statements made before the offender was placed behind bars.” Ante at 147. Rather, clearly the overall circumstances of the statements must control the court’s determination whether the emergency was truly ongoing. The majority inappropriately takes the Court of Appeals analysis to its logical extreme instead of accepting the simple proposition that a length of time between an initial event and police questioning is a factor relevant to whether the emergency is ongoing; some lapse of time does not require the automatic conclusion that an objective observer would perceive the emergency as having ended.

 I do not assert that “if there is an ‘ongoing emergency’ anywhere (or even what the police perceived to he such an “ongoing emergency”), a victim’s statements to the police are to be considered non-testimonial ....” Ante at 146 n 12. Rather, I simply conclude that any apparent distance must be viewed in context.

 Indeed, my disagreement with the majority centers on my conclusion that we should not reverse this case as a matter of law simply because the victim and the assailant were separated in some way where the Court of Appeals reached a supportable conclusion based on all the underlying facts. Whether the victim and the assailant are separated by a door (as in Hammon), by one block, by six blocks, or by ten blocks, the nature and persistence of the relevant emergency depend on the circumstances, including the type of danger or assault involved and the continued vulnerability of the victim (or others, when relevant) to further danger.

 I disagree with the majority’s secondary conclusion that the prosecution necessarily conceded that the statements were not dying declarations. See ante at 156-157. The prosecution did pursue only the excited utterance theory and admittedly never established the requisite foundation for a dying declaration. But I am not convinced that the prosecution’s statement — that there was a “lack of proof on whether the *165 deceased knew he was dying at the time” — constituted a concession that the victim’s statements could never be considered dying declarations. See ante at 155 n 20. The prosecution may have been admitting only that it could not support an argument on this point because it had not chosen to undertake the potentially difficult task of establishing the requisite proofs. In any event, the prosecution’s failures in these regards exemplify my primary concern: that the majority here creates bad law from bad facts resulting from the incomplete nature of the record.