DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALVIN DUNBAR,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D13-3255

[November 1, 2017]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Paul L. Backman, Judge; L.T. Case No. 12014154CF10A.

Carey Haughwout, Public Defender, and Emily Ross-Booker, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Cynthia L. Comras, Assistant Attorney General, West Palm Beach, for appellee.

SMALL, LISA, Associate Judge.

The defendant appeals his conviction and sentence for robbery. He raises four grounds to reverse his conviction and remand for a new trial: (1) the trial court committed reversible error in admitting the lead detective's testimony that he spoke to the victim's homeless shelter case manager who verified that the victim was employed and regularly drug tested; (2) the trial court committed fundamental error in giving the standard jury instruction 3.10, which implied the possibility of a light sentence; (3) the trial court committed reversible error in sentencing the defendant within the lawful sentencing range but failing to articulate its reasons for imposing the sentence; and (4) the Prison Release Reoffender statutory scheme is unconstitutional. Finding merit on the first issue, we address the first issue only and do not address the remaining issues.

We find that the trial court erred in admitting the victim's case manager's statements through the lead detective's testimony because the statements were inadmissible hearsay not subject to any hearsay exception. On appeal, the State conceded that it was error to admit the inadmissible hearsay but contended that the error was harmless. We find

to the contrary. Because the State's case was entirely dependent upon the victim's credibility, and these hearsay statements corroborated and bolstered the victim's testimony, the State cannot establish that the error was harmless beyond a reasonable doubt. Therefore, we reverse the conviction and remand for a new trial.

*Facts and Procedural History*

The State charged Dunbar and his co-defendant with one count of robbery.

At trial, the victim testified that he had been living at the Salvation Army homeless shelter for four to five months and that he had two jobs to pay his rent. On the night in question, the victim's friend drove the victim from work to the homeless shelter at approximately 11:00 p.m. and dropped him off behind the building. The victim entered the homeless shelter to get gas money to pay his friend for the ride. After the victim paid his friend, the victim counted his remaining funds. At that point, two men approached the victim. One of the men, the co-defendant, told the victim that he was "holding," which the victim understood to mean that the co-defendant had drugs for sale.

According to the victim, he was not interested in purchasing drugs and responded: "Okay." However, the defendants kept repeating, "I got that" and "I'm holding." Next, a verbal altercation between the victim and the defendants ensued. The defendants told the victim to "give [them his] loot." After the victim refused, the co-defendant hit the victim's face. The victim defended himself against the co-defendant's attack and a physical confrontation erupted with the defendant ultimately joining in the fight. Ultimately, the defendant and the co-defendant found and took the victim's fifty-dollar bill, a one-dollar bill, loose change, a money order and four bus passes, but they did not take his cell phone. After the defendants took the victim's money, they stood nearby while the victim called 911. The victim informed the defendants that he was calling the police. The defendants began to walk away.

When the police arrived, the defendant and the co-defendant ran. The victim, still on the phone with 911, yelled "that's him" as the officer approached. The officer saw two men running in different directions. The officer spoke to the victim who was very animated and upset. The police officers on scene did not believe that the victim was intoxicated or high on crack cocaine.

Finally, the officers were able to capture the defendant and the co-defendant. The officers recovered the fifty-dollar bill, the one-dollar bill and the bus passes from the co-defendant, and returned these items to the victim. After interviewing the defendant and the co-defendant, the lead detective believed that both men were high on crack cocaine. In addition to their intoxicated appearance, both men admitted smoking crack cocaine that evening. As the interview proceeded, the defendant changed his version of the events. However, the defendant maintained his claim that he and the co-defendant had been smoking crack cocaine with the victim. The defendant claimed that the group had been on their way to the homeless shelter so that the victim could get more money to buy more crack cocaine. The defendant's statement to the officers was played during the trial.

The victim denied asking the defendants for drugs. The victim explained that, as a homeless shelter resident, he was not permitted to use drugs or alcohol. To ensure compliance with the policy, the homeless shelter drug tested residents about once a week. The victim stated he was drug tested more often than other residents due to his late night work schedule and explained that any resident who failed a drug test would not be allowed to continue residing at the shelter.

During the lead detective's direct examination by the State, the following occurred:

> [PROSECUTOR:] Okay. And considering that [the victim] was living at the Salvation Army, were you able to verify his employment?
>
> [LEAD DETECTIVE:] Yes. I was actually able to verify --
>
> [DEFENSE ATTORNEY:] Objection.
>
> [TRIAL COURT:] That's sustained.
>
> [PROSECUTOR:] Were you able to verify that he actually lived at the Salvation Army?
>
> [LEAD DETECTIVE:] Yes.
>
> [PROSECUTOR:] And were you able to verify if he ever gets tested?

[LEAD DETECTIVE:]  I spoke with his case worker in the work program --

[DEFENSE ATTORNEY:]  Objection.  Hearsay.

[TRIAL COURT:]  Overruled.

[PROSECUTOR:]  You could answer.

[LEAD DETECTIVE:]  And she stated that, yes.  All of the persons who were involved in a work program, the Salvation Army regularly drug tested.

[PROSECUTOR:]  What's the purpose of you verifying his employment and talking to his caseworker?

[LEAD DETECTIVE:]  Just to verify the whole story.  I knew exactly what the defense would be in this case.  It would be based on the statements that were given by [the co-defendant] and [the defendant].  And, you know, [the victim], he seemed like a fine guy to me.  But he's a homeless guy.  And I wanted to debunk anything that's going to be presented here at trial now. . . .

Later, the State referenced this inadmissible hearsay testimony in closing argument in response to the defendant's argument that the police "slanted" the case and the lead detective was a "bought referee."  The prosecutor argued in rebuttal:

"Slanted from the beginning," [the lead detective] had it out for [the defendant] and he was trying to break him.  He's a referee that has been bought.  Well, I asked him, "[lead detective], knowing that the victim lives at the [homeless shelter], does that provide any hesitation for you?  Does it make the case a little bit more difficult?"  And you know, it does.

Because I think a lot of people, when they hear [homeless shelter], "It must be a bad area, he's homeless.  You know what, he probably was smoking crack." . . .

Well, I asked [the lead detective] about that and he said, yes.  You know, I took a statement from [the co-defendant].  I took a statement from [the defendant].  You know, they didn't

4

exactly jive. And I called back [the victim] and confronted him with this information. [The victim] says, "Listen, I live at the [homeless shelter]. My curfew, in fact, is a little bit later because of the funeral situation, funeral home. And, therefore, I get tested even more often." [Lead detective], "Did you verify with [the homeless shelter] that he gets tested and he lives there? Yes. I did. Why? Because . . . of the nature of the situation." [Lead detective], did you verify that [the victim] works at Jimmy Johns? Yes. I did, because of the nature of the situation." He's not a bought referee. He's doing his job.

On appeal, Dunbar argues that the trial court committed reversible error when it permitted the State to solicit testimony from the lead detective that he had spoken to the victim's case manager and her statements corroborated certain aspects of the victim's story. The State admits that this testimony was admitted in error but argues that the error was harmless beyond a reasonable doubt.

*Analysis*

"The standard of review for the admissibility of evidence is abuse of discretion, limited by the rules of evidence. Whether evidence falls within the statutory definition of hearsay is a matter of law, subject to *de novo* review." *Lucas v. State*, 67 So. 3d 332, 335 (Fla. 4th DCA 2011) (citations, quotation marks, and alteration omitted).

In this case, the lead detective testified that, in order to verify the victim's story, he spoke to the victim's homeless shelter case manager. The victim's case manager did not testify at trial. Instead, the State sought to introduce her statements through the lead detective. Over the defendant's objections, the lead detective testified that the victim's case manager confirmed that the victim resided at the homeless shelter. More importantly, the jury learned, through the lead detective, that the case manager also said that all shelter residents who participate in the work program were regularly drug tested. The State introduced the victim's case manager's out-of-court statements for two purposes: 1) to show that the lead detective conducted an unbiased and thorough investigation to either corroborate or debunk the victim's story, and 2) to prove that the victim's testimony, that he was a homeless shelter resident who was frequently drug tested, was credible.

As the victim's case manager's out-of-court statements were admitted to prove the truth of the matter asserted, these statements constituted

5

classic hearsay. No hearsay rule exception applies to render these statements admissible. Therefore, the State correctly concedes that these statements were inadmissible hearsay.

The harmless error test applies to improperly admitted hearsay evidence. *See Kendrick v. State*, 632 So. 2d 279, 279 (Fla. 4th DCA 1994). "The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986).

Witness credibility was critical in this case because no physical evidence or independent eye witness testimony corroborated the victim's version of the events. The defendant's theory at trial was that he and the co-defendant sold crack cocaine to the victim and then the three smoked the victim's crack cocaine together. His theory explained why the co-defendant was in possession of the victim's money and also why he and his co-defendant ran from the police. His theory was corroborated by the officer's testimony that both the co-defendant and the defendant appeared to be high on crack cocaine.

The State sought to rebut the defendant's theory through the victim's testimony that the victim received frequent drug testing at the homeless shelter. The victim was adamant that he would not jeopardize his place at the homeless shelter by smoking crack cocaine. The victim's case manager's statements to the lead detective provided independent corroboration to this aspect of the victim's testimony. Later, the error was further compounded when the State referenced the testimony in rebuttal closing.

Under these circumstances, the State cannot meet its burden to establish that this error was harmless. Therefore, we must reverse the conviction and remand for a new trial. *See Lewis v. State*, 80 So. 3d 442, 444-45 (Fla. 4th DCA 2012) (finding harmful error where police officer testified that two non-testifying witnesses gave him information which caused him to develop the defendant as a suspect in a case that rested on witness credibility); *Carter v. State*, 951 So. 2d 939, 944-45 (Fla. 4th DCA 2007) (finding harmful error where the State introduced police reports containing the victim's inadmissible hearsay statements where witness credibility was crucial and prosecutor referred to the reports in closing argument); *Szuba v. State*, 749 So. 2d 551, 552-53 (Fla. 2d DCA 2000) (reversing for a new trial where witness credibility was critical to the case

6

and police officer testified that witnesses to the crime "gave him consistent descriptions of the defendant").

*Reversed and remanded for new trial.*

LEVINE and CONNER, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***