DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KEVIN JOSEPH,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D16-2120

[June 27, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Mindy F. Solomon, Judge; L.T. Case No. 06-2016-CF-001383 A.

Carey Haughwout, Public Defender, and Benjamin Eisenberg, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Mitchell A. Egber, Assistant Attorney General, West Palm Beach, for appellee.

### *ON MOTION FOR CLARIFICATION*

CONNER, J.

We grant the State's motion for clarification, withdraw our previously issued opinion, and substitute the following in its place.[1]

Appellant Kevin Joseph timely appeals his conviction and sentence after a jury found him guilty of the lesser-included offense of aggravated battery. Appellant asserts the trial court erred in: (1) granting a pretrial motion to admit two recorded statements by the Victim, after determining the Victim was unavailable for trial due to actions by Appellant; (2) denying his motion to reconsider the admission of the Victim's recorded statements and his motion to continue the trial; and (3) admitting a recorded call by Appellant from the jail to an unidentified female. We affirm without discussion the trial court's denial of the motion for reconsideration, the

---

[1] We incorrectly stated in the original opinion that Appellant and his co-defendant were tried together.

denial of the motion to continue, and the admission of Appellant's jail call. We reverse the trial court's evidentiary determination that the Victim's recorded statements were admissible as a forfeiture-by-wrongdoing exception to the hearsay rule. We remand for a new trial because the error was not harmless.

*Background*

As the prequel to the incident that led to the prosecution which is the subject of this appeal, the Victim and his girlfriend ("the Girlfriend") were sent to a residence to clean it. Appellant confronted the Victim and the Girlfriend at the residence and explained that he was in control of the neighborhood and they needed to leave the house they were cleaning. The confrontation escalated to the point of Appellant pointing a gun at the Victim, which the Girlfriend recorded on her cell phone as a video. No physical injuries occurred during that incident.

A few days later, the Victim was attacked and beaten, which caused him to be hospitalized. The Victim gave a statement recorded by the main investigating officer ("the Detective") a few hours after he was hospitalized, describing the events that caused his hospitalization. The Victim explained that as he was walking to church, he passed a man ("the Co-Defendant") on the street who said, "Oh, is that [the Victim]?" and "Hey, n*****, when I – when my homeboy see [sic] you, he going to f*** you up." The Co-Defendant intentionally blocked the Victim's path, put his face in the Victim's face, and said "N*****, I'm going to make him f*** you up." The Victim then turned around and saw Appellant approaching him, and Appellant asked the Victim whether he remembered him from the prior altercation.

The Victim said at that point, the Co-Defendant snuck up behind him and tried to punch him, and then the Co-Defendant swung a pipe, which the Victim blocked with his hand. As the Victim and Co-Defendant were wrestling, Appellant approached with another pipe and hit the Victim in his jaw from behind. The Victim was then hit again, but was disoriented and could not determine who hit him. The Co-Defendant and Appellant then ran away. In the recorded statement, the Victim also explained the extent of his injuries. Additionally, he stated that, when he arrived at the hospital, he noticed that he was missing $80 in cash that he was sure he had before he was attacked. In conjunction with the recorded statement, another detective conducted a photo lineup in which the Victim identified Appellant as one of his assailants.

The Victim was shown a second photo lineup in which he identified the

Co-Defendant as the other assailant. In conjunction with the second lineup, the Victim gave a second recorded statement to the Detective. In the second recording, the Victim confirmed that he had identified the Co-Defendant in a photo array. The Victim then explained the incident and his injuries. He also specifically mentioned being on "a liquid diet." The Victim reiterated that both Appellant and the Co-Defendant "jumped [him] with metal pipes" and hit him several times.

Appellant and the Co-Defendant were arrested and both were charged with attempted first-degree murder and strong arm robbery. Appellant and the Co-Defendant were tried separately. Appellant was incarcerated from the date of his arrest until trial. The Co-Defendant bonded out of jail after his arrest.

Shortly before trial, the State moved to declare the Victim unavailable for trial and to admit his recorded statements pursuant to the doctrine of forfeiture-by-wrongdoing. The State alleged that Appellant "engaged in efforts with [Co-Defendant] to prevent or persuade [the Victim] from testifying in th[e] trial."

The State's motion included four attachments. The first attachment was a DVD that contained seventy-eight recorded jail calls between Appellant and various individuals totaling approximately thirty hours in length. The motion alleged that the pertinent excerpts from the jail calls were as follows:

> In a recorded jail call on February 5, 2016, [Appellant] states, "Don't pay none of that s*** until we go to court. This n**** out here demanding ransom." He also states, "YB over in the village cause they out there lookin for bro because he's lying on the papers. The whole neighborhood knows what happened."

> In a recorded jail call on February 6, 2016, [Appellant] states, "We gotta catch this f*** n**** and bring his ass to justice."

> In a recorded jail call on April 6, 2016[,] [Appellant] states, "I gave my lawyer all the names and he's gonna demand a speedy trial. Now all we gotta do is find buddy and see whatever else we gotta take care of." He also states, "We gotta stay strapped and swipe this s*** out."

> In a recorded jail call on April 8, 2016[,] [Appellant] states, "I'm gonna send his ass to the hospital. N****s on liquid diets,

3

needing surgery.  I do this shit.  I do this shit with dangerous weapons."

The motion alleged that Appellant was speaking to Co-Defendant in "many" of the calls, but does not specify which calls.

The second attachment was an affidavit by an investigator with the State Attorney's Office ("the Investigator").  The Investigator attested that when he arrived at the Victim's residence to serve him with pre-trial subpoenas, the Victim's mother stated that the Victim "does reside at the home, but was not present at that time."  She also stated that the Victim had not been home "for several days, but that she would ensure that he received the paperwork as soon as she ha[d] contact with him."  The mother provided to the Investigator a contact phone number.

The third attachment was the transcript of a sworn statement taken by the Detective from the Girlfriend while the Girlfriend was incarcerated.  The Girlfriend stated that, in mid-January, the Co-Defendant's sister went to the Victim's house and offered him $20,000 not to cooperate or show up at trial.  The Victim told the sister that that was not enough money.  The Girlfriend also stated that after the Co-Defendant was released from jail, he went to the Victim's house to offer him money.  A "physical confrontation" occurred between the Co-Defendant and the Victim because the Co-Defendant wanted the Girlfriend's cell phone, which contained video evidence of the prior altercation between Appellant, the Victim, and the Girlfriend.  The Co-Defendant was unable to get the cell phone because the Girlfriend had turned it over to law enforcement.

The Girlfriend also stated in the transcript that the Victim told her that after the $20,000 money offer, someone gave the Victim a pit bull, dog food, and other pet items.  The Girlfriend believed that someone was "trying to buy [the Victim] off."  Additionally, "they" knew that the Girlfriend and the Victim "were looking to buy a vehicle," so "they offered to supply a vehicle, paid in full."  The transcript does not indicate who "they" were.

In the transcript, the Girlfriend also stated that the Victim told her the Co-Defendant's sister and someone else said that, if the Girlfriend and the Victim did not accept the money, "[o]ther things were going to occur." "They" said something about "the house being shot up" and that the Girlfriend and the Victim would "be sorry."  The Victim told the Girlfriend "not to come back in the neighborhood" because if she went back, she was going to be killed.  When the Detective asked the Girlfriend if she knew who the Victim was referring to "carry out the threats," the Girlfriend

4

replied, "He was referring to [Co-Defendant] and [Appellant]," and the Girlfriend felt that "they themselves directly would take care of it." However, at a later point in the interview, the Girlfriend also stated that she was not aware of anyone other than the Co-Defendant and his sister who promised money or made threats.

The final attachment was an affidavit by the Detective. He attested that, after the Victim failed to comply with the subpoena, he went to the Victim's prior known address and found the residence vacant. The Detective then went to the Victim's mother's residence, and the mother stated that "she had not heard [from] or seen [the Victim] in 3–4 weeks, and that she did not know his whereabouts." The Detective did not believe the mother.

The Detective then went to speak with the Girlfriend at the jail. He listened while the Girlfriend called the Victim's mother's residence, and the mother put the Victim on the line. The Detective jumped into the conversation to advise the Victim that the assistant state attorney needed to meet with him to prepare for the upcoming trial, and the Victim responded that "he would not cooperate with the [S]tate." The Detective further informed him that, because he failed to comply with the subpoena, the next step could be a writ of bodily attachment, to which the Victim responded that "he did not care, that he 'knew' his rights, and that a warrant would not be issued for his arrest."

Based on his conversation with the Victim, the Detective asserted in the affidavit that he believed "it [wa]s clear that the Victim won't voluntarily cooperate with the prosecution." Additionally, he believed that, "based on the level of violence exhibited during th[e] case," the Victim's "lack of cooperation [wa]s most likely based on a well-founded fear for the safety of his family and himself." The call between the Detective and the Victim occurred prior to the Detective obtaining the Girlfriend's sworn statement attached to the motion.

Appellant filed an objection to the State's motion. He asserted that the four attachments in the State's motion were either "completely out of context, or completely undermine[] [the State's] own argument and show the exact opposite," and that none of the actions against the Victim could be attributed to Appellant.

Regarding the February 5, 2016 jail call, Appellant asserted that: (1) he was in custody and had no contact with the Victim; (2) he believed that the Victim was "trying to blackmail individuals for money"; (3) he was "not [i]n agreement to pay[] any money to th[e] Victim"; and (4) he believed the

5

Victim "[wa]s lying and the area and [t]he neighborhood kn[e]w[] that the [Victim wa]s lying." Appellant supported these statements by pointing out that, at another point during the same call, Appellant stated:

> I heard trolls are looking for [the Victim's] ass though, they locking his ass up. Even Kerven told me. You know YB Sneeds brother, overthere [sic] in the villa, he even said they looking for bruh, the man is making false statement on the paper bruh, the lawyer told me they locking him up for lying on the paper and shit, that n**** trying to f*** us over, and he the one getting f***ed over.

Regarding the February 6, 2016 call, Appellant explained that another portion of his conversation was as follows: "n**** got to sit here until the next month, all real n****z, that's some crazy s***, we gotta catch this f*** n**** Cuz." Appellant asserted that this statement showed his "disbelief that he [wa]s still in jail over the [Victim's] lies to police" and "his frustration while speaking [to] his female cousin." Additionally, Appellant asserted that this statement did not establish that he "agreed to and/or commanded anyone to tamper with the [V]ictim."

Regarding the April 6, 2016 call, Appellant asserted that "[m]ost of the words in that statement [were] NOT [Appellant's] words but rather the individual he is talking to," and the statement related to "defense witnesses and getting ready for trial," not tampering with a witness.

Lastly, regarding the April 8, 2016 call, Appellant asserted that he was not talking about the Victim, "but rather having a bit of fun talking to a relative and using his own colloquial language."

At the hearing on the State's motion, the State did not present any witnesses, but relied solely on its written motion and the attachments. The trial court based its ruling on the affidavits, the jail call excerpts described in the motion, and the transcript of the Girlfriend's statement. It found that the State, "on numerous occasions," attempted to contact the Victim to no avail and, therefore, the Victim was unavailable for trial. Although at one point the trial court stated that it was "not in a position to determine what the intent of what those jail calls were," after considering the words of Appellant in the recorded calls, the court found that, "by a preponderance of the evidence, the State has shown that this [Appellant's wrongdoing] trumps the Sixth Amendment Crawford[2] issue" and the Victim's two recorded statements were admissible.

---

[2] *Crawford v. Washington*, 541 U.S. 36 (2004).

After the trial court ruled on the forfeiture-by-wrongdoing motion, Appellant moved for reconsideration and for a continuance, which were both denied.

At trial, in addition to law enforcement witnesses, the State played both recordings of the Victim's statements. The Detective also testified that when he told Appellant that he was being arrested for robbery and attempted felony murder, Appellant responded that he "didn't try to kill anybody," and that he "just intended to beat up a guy." The State also played a recording of a jail phone call between Appellant and an unknown female. During the call, Appellant made reference to the fact that "I got there and he's on a liquid diet like I use (sic) to have this--Every time I seen him, somebody's hurt. . . . They got to get surgery. . . . I am talking about face plastic surgery. You heard me? I do this s***, man."

After the State rested, Appellant called four witnesses. Each testified that they were present during an incident between the Co-Defendant and the Victim, and that the Victim was the aggressor. Three of the witnesses testified the Appellant was present, but did not join the fray until after the Co-Defendant was attacked. The fourth witness did not remember seeing Appellant during the fray. None saw Appellant hit the Victim with a pipe. Instead, all four testified that it was the Victim who had the pipe and it was the Victim who attacked the Co-Defendant with the pipe.

After the defense rested, the State called a rebuttal witness. The rebuttal witness testified that while looking outside her window, she saw two men beat another man with fists and with a "big, long stick [or] pole." The two men repeatedly hit the Victim in the head, kicked him, and punched him. The rebuttal witness did not see the Victim carrying a weapon at any point, and she saw the Victim bleeding "quite a bit" from his head. On cross-examination, the witness was sure that one of the men was using the stick, but she was not sure whether the other man used the stick at all.

On the attempted first-degree murder count, the jury found Appellant guilty of the lesser included charge of aggravated battery and specifically found Appellant did not actually possess a weapon. On the robbery count, the jury found Appellant not guilty. Appellant was adjudicated guilty of aggravated battery and sentenced to fifteen years of prison. Appellant gave notice of appeal.

*Appellate Analysis*

"A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion, limited by the rules of evidence." *Seymour v. State,*

7

187 So. 3d 356, 358 (Fla. 4th DCA 2016) (citing *Alvarez v. State*, 147 So. 3d 537, 542 (Fla. 4th DCA 2014)). "The harmless error test applies to improperly admitted hearsay evidence." *Dunbar v. State*, 230 So. 3d 8, 12 (Fla. 4th DCA 2017).

Appellant asserts that the trial court erred in admitting the Victim's two recorded statements by applying the forfeiture-by-wrongdoing exception to hearsay. The Appellant seeks a new trial. The State responds that it met its burden of showing the exception applies, through the Girlfriend's sworn statement, the Detective's sworn statement, and Appellant's jail calls. That combination of evidence was relied upon by the trial court to establish that the victim was unavailable for trial and Appellant had "acquiesced in preventing the Victim from testifying by threats and chicanery." The State also responds that, even if there was any error, it was harmless, because eyewitness testimony and Appellant's admission to law enforcement were also admitted to prove Appellant was one of the assailants. The State therefore argues that we should affirm Appellant's conviction and sentence.

The Florida Evidence Code provides that "[e]xcept as provided by statute, hearsay evidence is inadmissible." § 90.802, Fla. Stat. (2016). "This means that the only exceptions to the hearsay rule in Florida are the ones recognized by statutes such as sections 90.803, 90.804, and 90.805, Florida Statutes[.]" *Mortimer v. State,* 100 So. 3d 99, 102 (Fla. 4th DCA 2012).

The doctrine of forfeiture-by-wrongdoing was codified by statute in 2012 as a hearsay exception:

> (2) Hearsay Exceptions.—The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
>
> . . . .
>
> (f) *Statement offered against a party that wrongfully caused the declarant's unavailability.*—A statement offered against a party that wrongfully caused, or acquiesced in wrongfully causing, the declarant's unavailability as a witness, and did so intending that result.

§ 90.804(2)(f), Fla. Stat. (2016); *see also Mortimer,* 100 So. 3d at 102-03. The statutory change adding the hearsay exception to the Florida Evidence

8

Code was approved by the Supreme Court in 2014. *In re Amendments to the Florida Evidence Code*, 144 So. 3d 536, 537 (Fla. 2014).

The forfeiture-by-wrongdoing exception to hearsay "is a codification of the common law rule that one who wrongfully procures the absence of a witness from court cannot complain of the admission of the hearsay statement of the witness." *Id.* Under the common law, the forfeiture-by-wrongdoing doctrine "permits the introduction of out of court statements of a witness, where the witness is kept away from trial by the 'means or procurement' of the defendant." *Mortimer*, 100 So. 3d at 102 (quoting *Giles v. California*, 554 U.S. 353, 359 (2008)). "For the exception to apply, the defendant must have 'engaged in conduct designed to prevent the witness from testifying.'" *Id.* (quoting *Giles*, 554 U.S. at 359).

As can be seen from the statute, the admissibility under the forfeiture-by-wrongdoing exception depends on two evidentiary showings: (1) the statement was made by a witness who is unavailable to testify at trial, and (2) the party against whom the statement is being used intentionally caused or intentionally acquiesced in wrongfully causing the unavailability of the witness. Appellant attacks the trial court's ruling on both prongs.

We affirm, without further discussion, the trial court's ruling that the Victim was unavailable to testify at trial. We address the trial court's ruling that the evidence showed Appellant intentionally caused or intentionally acquiesced in wrongfully causing the unavailability of the Victim.

Appellant argues the evidence showed that he remained incarcerated from the date of his arrest until trial and none of the State's evidence shows that Appellant ever communicated with the Victim or the Girlfriend. Although the Girlfriend mentioned the efforts of the Co-Defendant and his sister to bribe the Victim and the Girlfriend, and the Co-Defendant's effort to threaten the Victim, the Girlfriend did not state that Appellant himself ever bribed or threatened the Victim or direct anyone to make such bribes or threats.

The Girlfriend's sworn statement alleged the Victim described an incident where the Co-Defendant threatened the Victim in person, and the Girlfriend thought that the Victim felt the Co-Defendant and Appellant were going to carry out the threats. However, when the Detective asked the Girlfriend whether anyone other than the Co-Defendant and his sister bribed or threatened the Victim, the Girlfriend stated: "Not that I'm aware." Thus, the Girlfriend's statement focused on the Co-Defendant's, not Appellant's, specific statements and intent. The Girlfriend's sworn

statement does not support the conclusion that Appellant instructed the Co-Defendant to threaten the Victim, or acquiesced in the Co-Defendant's plan to threaten the Victim. Additionally, the Detective's affidavit references the Girlfriend's statements that the Victim was threatened by the Co-Defendant and his sister, but the Detective does not mention any threats made by Appellant. The most that can be concluded from the Girlfriend's statement is that her impression was that the Victim felt Appellant and the Co-Defendant would carry out threats of harm, but the Victim never clearly indicated that Appellant made any statements regarding harm.

In the excerpted jail calls cited in the State's motion, Appellant does not mention the Victim by name or mention any plan or scheme to keep him away from trial. Although the State asserted in its motion that in "many" of the calls Appellant was speaking to the Co-Defendant, it failed to specify which calls. Appellant asserts that, when the calls are taken in context, they do not support a finding that Appellant acted with the intent to influence the Victim. Even assuming Appellant was referring to the Victim in the call that discusses sending someone to the hospital, that call does not indicate that Appellant acted with the purpose of sending the Victim to the hospital to prevent him from testifying. Thus, the State did not meet its burden in proving that the statements are admissible pursuant to the forfeiture-by-wrongdoing exception. *See* § 90.804(2)(f), Fla. Stat. (2016); *Giles*, 554 U.S. at 359; *Mortimer*, 100 So. 3d at 102; *Chavez*, 25 So. 3d at 52–53.

Absent any evidence which would prove Appellant directly or indirectly engaged in conduct or facilitated conduct that would cause the Victim to be unavailable for trial, the State would be required to prove that Appellant intentionally acquiesced in wrongful conduct which caused the Victim to be unavailable. Although our research has not revealed case law which provides guidance as to what behavior constitutes acquiescence, it would seem that the evidence must at least show that Appellant knew of a plan by one or more persons to engage in conduct or facilitate conduct that would cause the Victim to be unavailable for trial, and Appellant either encouraged the plan or did nothing to dissuade others from such conduct or distance himself from the plan. Our review of the record and the evidence considered by the trial court does not reveal any proof that Appellant acquiesced in making the Victim unavailable for trial. We are not persuaded by the State's argument that the fact Appellant was communicating with the Co-Defendant in the same time frame that both the Co-Defendant and his sister were attempting to bribe the Victim and the Girlfriend, and the threats made to the Victim, was sufficient proof of Appellant's wrongful conduct or acquiescence to wrongful conduct. The

content of the words used by Appellant during the recorded calls do not support such a conclusion because the context of the words in the various conversations is substantially ambiguous. Most significantly, the Girlfriend never said that the Victim described any statements by Appellant regarding the bribes or the threats.

We also reject the State's argument that any error in admitting the Victim's statements was harmless. The testimony of the State witnesses differed significantly from the testimony of the defense witnesses, and there is a reasonable possibility that the jury considered the Victim's own explanation of the incident in reaching a verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986); *see also Powell v. State*, 99 So. 3d 570, 575 (Fla. 1st DCA 2012) (holding that an error is not necessarily harmless merely because the erroneous testimony was cumulative to other testimony). In closing arguments, the prosecutor referred to the Victim's testimony "through his sworn statement" that Appellant struck him with metal pipes.

Having determined that the Victim's recorded statements were improperly admitted into evidence, and the error was not harmless, we reverse Appellant's conviction and sentence for aggravated battery and remand the case for a new trial.

*Affirmed in part, reversed in part, and remanded.*

GERBER, C.J., and TAYLOR, J., concur.