# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00030-COA

**BOBBY MONTSON**                                             **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2018 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 10/27/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1. Claiming self-defense, a husband was charged with first-degree murder after he shot and killed his wife. He was convicted by a jury of his peers.

¶2. On appeal, the husband argues that the trial court violated his constitutional rights by admitting testimonial and hearsay statements into evidence over his objection. He also claims that the trial court excluded evidence that would have supported his self-defense theory. Because his right to confrontation was violated, we reverse his conviction and

remand his case to the circuit court for a new trial.[1]

**FACTS**

¶3.     At approximately 3:00 a.m. on September 12, 2016, the Jackson Police Department (JPD) responded to a shooting at an apartment complex. When they arrived at the scene, they found Linda Montson bloodied and unresponsive on the living room floor of one of the apartments. She had been shot multiple times in the face and arms.

¶4.     Upon his arrival, lead detective Jermaine Magee of JPD initiated an investigation into Linda's death. He took statements from her sons, Stephon and Marquis Lindsey, and Stephon's uncle, Christopher Leggett.[2] The statements elicited from the witnesses were nearly identical—each had awoken to a scream followed by several gunshots. Shortly thereafter, they observed Bobby Montson, Linda's husband, walking away calmly from the apartment with a gun in his hand.[3]

¶5.     The remaining officers at the crime scene found spent shell casings near Linda's body upon searching the area. Investigators also noticed that boxes were packed in a corner as if

---

[1] Because this outcome is dispositive, we do not address the husband's pro se supplemental brief.

[2] There is a conflict in testimony regarding whether Christopher Leggett is Linda's son and whether he was present at the apartment on the night of her murder. Detective Magee testified that Christopher was Linda's son and that Christopher informed him that he was present on the night of Linda's murder. However, Stephon testified at trial that Christopher is actually his uncle and that Christopher was not at the Montson residence on the night of Linda's murder.

[3] Stephon explicitly testified he saw a gun in Montson's right hand. Montson claims that Marquis, who did not testify at trial, did not see a gun in his hand.

someone was preparing to move out of the apartment. Weeks later, one of Linda's sons found a gun underneath a pillow in a bedroom and brought it to the police.

¶6. One of Linda's sons informed the detective that his mother had previously filed an affidavit against Montson to prosecute him for domestic violence because Montson had allegedly threatened to kill her. Detective Magee later drove to the police department to retrieve it. In the affidavit, Linda reported Montson's alleged threats with the following language:

> Bobby said if I leave him that he will blow my brain of way [sic]. He has told me this in my home and in front of other person in a place call the green room. In this place call green room they had to band [sic] him from coming because on 9-4-15 he pull out a gun & said he was going to kill me.

¶7. The record reflects that on the day Linda filed the complaint, JPD also issued Linda a case information card. Signed by Linda, the card read, "[T]he possession of this card indicates that you have become a victim of a criminal act." A warrant was subsequently issued to compel Montson's appearance to answer the charges.

¶8. Police arrested Montson for the murder of his wife. He claimed that he shot Linda in self-defense after she drew a gun and aimed it at him.

## I.     Pretrial Motions and Procedural Background

¶9. Among several other pieces of evidence, Montson and the State disputed the admissibility of Linda's affidavit, the detective's testimony, and an alleged past event involving Linda that Montson argued would strengthen his self-defense theory.

*The Trial Court Allows Linda's Affidavit*

3

¶10. The State sought to admit Linda's affidavit into evidence, claiming that Detective Magee would need it to fully and adequately explain the course of his investigation. Specifically, the State insisted that the admission of the document was necessary to explain what led the detective to arrest Montson. The State also intended to use its contents to prove that Montson fulfilled his alleged promise to kill Linda if she ever attempted to leave him.

¶11. Montson denied ever making the statements and objected on Confrontation Clause grounds, arguing he would not be afforded an opportunity to cross-examine Linda concerning those statements. Conversely, the State argued that Montson forfeited his right under the Confrontation Clause to cross-examine Linda because he was responsible for her death. Finding its contents more probative than prejudicial, the trial court ultimately allowed admission of the affidavit to be admitted into evidence.

*The Trial Court Allows Detective Magee's Testimony*

¶12. The State also asked the court to allow Detective Magee to testify about the statements he had received from Stephon, Marquis, and Christopher. His testimony would include details about what the witnesses told him at the crime scene, like how Linda's sons heard a scream and gunshots and saw Montson walking away with a gun from the window. The detective would also recount his mission to retrieve Linda's affidavit from the police department. Finally, the detective would disclose Linda's statements within the affidavit to the jury.

¶13. Montson objected and argued the detective's testimony would be hearsay. As a

4

counter argument, the State provided caselaw to demonstrate that courts have traditionally allowed detectives to repeat witnesses' statements to explain the course of an investigation. The trial court ultimately ruled in the State's favor and allowed Detective Magee to testify about the witness' statements. However, the court cautioned the State to avoid allowing the detective to repeat the witnesses' statements word-for-word. Rather, the detective would be permitted only to disclose those portions of the statements that were reasonably necessary to aid the jury in understanding the core steps of the detective's investigation.

*The Trial Court Excludes an Incident Involving Linda*

¶14.    In support of his self-defense theory, Montson sought to allow the admission of a past incident where Linda allegedly drew a firearm and began shooting in the family's home on Thanksgiving Day. Montson further claimed that on the same night, Linda "got into a shootout" with the police department and aimed a gun at him when Montson was handcuffed in the back of a patrol car. He planned to use the evidence to show that Linda was always carrying a gun, "knew how to use it," and ultimately threatened Montson's life with a gun before he killed her.

¶15.    According to the State, an officer stated that Linda had aimed a weapon at Montson because she was severely distressed and because Montson was beating her "within an inch of her life." When he arrived at the crime scene, the officer confirmed that Montson had attacked Linda and that a "shootout" did not occur.

¶16.    The trial court ruled that none of Linda's previous arrests or convictions would be

5

allowed into evidence unless the "door [was] opened."

## II.    Trial Court Testimony

¶17.    As expected, Detective Magee testified on behalf of the State about the course of his investigation into Linda's murder. When prompted to share what he had learned with the jury, the detective relayed each witness's statements in detail. He testified that the witnesses told him that they were awoken by a scream and the sound of several gunshots. According to the detective, the witnesses peered from a window and saw Montson calmly walking away from the apartment. The detective also specified that Stephon told him he saw a gun in Montson's hand.

¶18.    Detective Magee further testified that Marquis told him about Montson's past threats, which prompted his mother to file an affidavit seeking his prosecution for domestic violence. The detective then explained to the jury that based on that information, he retrieved the affidavit from the police department and found Linda's documented complaint regarding Montson's threats. After admitting the document into evidence, the State ordered the detective to read the contents of the affidavit word-for-word to the jury. Detective Magee read its contents and finalized his testimony by explaining that he used the above information to arrest Montson.

¶19.    Investigator Robert Watts, who was employed at JPD as a crime scene investigator, testified that he found spent shell casings from a 9-millimeter Luger near Linda's body. He also testified that boxes and a vacuum cleaner were in the corner of the apartment when he

6

investigated the scene, as if someone was preparing to move to another location. Finally, Investigator Watts provided his professional opinion that Linda was standing still at the time Montson shot her, based on the location of the shell casings.

¶20. Doctor Mark LeVaughn, chief medical examiner for the Department of Public Safety, testified that he had performed about 12,000 autopsies in his twenty-year career, and that he was responsible for examining Linda's body. He testified that Linda received some of the gunshot wounds in her forearm, and that these wounds typically indicate "defensive-type" posturing of the victim. He also testified that she was shot within close range (the gun was within two to three feet of her arm).

¶21. Stephon testified that he had heard his mother's scream for "help," followed by the sound of several gunshots.[4] According to Stephon, each gunshot was preceded by a brief deliberate pause. When Stephon walked into the living room, he saw his mother's dead body on the living room floor. He testified that as he peered out of a window, he observed Montson walking away from the apartment as if he "were not in a rush" while holding a gun in his right hand. Stephon stated that Linda had planned to move away from Mississippi before Montson killed her.

¶22. Finally, Montson testified. He claimed that on the night he shot Linda, he and Linda planned to spend the evening househunting and watching a movie at a movie theater

---

[4] Stephon Lindsey was the only one of Linda's sons who testified at trial. Marquis Lindsey and Christopher Leggett were not called to testify.

afterward. The couple drove separate cars to a bar called The Green Room, where Montson parked his vehicle so that he could travel in the passenger seat of Linda's car. After a brief look for a new house, the couple ate at a restaurant and then stopped at a convenience store.

¶23. Montson claimed that he noticed a substantial change in Linda's behavior and attitude when she walked out of the convenience store and returned to their car. Instead of driving to the movie theater as they had initially planned, she drove Montson back to The Green Room and began "going off" on Montson, repeating, "[Y]ou think you slick."

¶24. Montson went inside the bar and left Linda in the car. He testified that after playing a game of pool for about forty-five minutes, he returned to the car to find Linda smoking marijuana and drinking alcohol. He testified that he tried to get her to stop because the substances did not "mix well" with the medication she was taking at the time. According to Montson, Linda resisted his request and cursed him.

¶25. Montson testified that after that transaction, he left Linda again and spent an additional hour in The Green Room. He walked outside and found that Linda was still drinking alcohol in her car. Rather than approaching her, he opted to leave The Green Room in his own car, drive around the city for a while, and spend time at another bar.

¶26. Montson testified that when he finally returned to his and Linda's apartment, he found her sitting on the living room couch. According to Montson, Linda suddenly leapt from the couch, drew a gun, and pointed it at him. He testified that he briefly struggled to take the gun from her until he finally succeeded. His version of the events leading to Linda's death was

8

that he attempted to walk toward the hallway to pack his belongings once he was able to take the gun from her. But the sound of a gun "cocking" stopped him.

¶27. According to Montson, he turned to see Linda pointing another gun at him. Armed with the gun he previously retrieved from her, Montson shot Linda several times because he was "scared for his life." He stated that once he realized he killed her, he exited the apartment, discarded the gun, and stopped at his mother's house before fleeing to Chicago.

¶28. After its deliberations, the jury found Montson guilty of first-degree murder. The circuit court sentenced him to life in prison. Aggrieved, Montson appeals.

## STANDARD OF REVIEW

¶29. An appellate court employs an abuse-of-discretion standard when analyzing a trial court's decision to admit or exclude evidence. *Clark v. State*, 891 So. 2d 136, 139 (¶11) (Miss. 2004). As to issues regarding the Sixth Amendment, "[t]his Court reviews de novo a Confrontation Clause objection." *Smith v. State*, 986 So. 2d 290, 296 (¶18) (Miss. 2008).

## DISCUSSION

¶30. Montson presents three main arguments on appeal. First, he argues that the trial court violated his Sixth Amendment right to confrontation when it allowed the introduction of Linda's affidavit. Second, Montson claims that the trial court erred in allowing Detective Magee's testimony because it contained inadmissible hearsay statements. And third, Montson insists that the trial court deprived him of his right to a fair trial by excluding evidence that supported his self-defense theory. We address each of these claims in turn.

9

## I.    The trial court violated Montson's Sixth Amendment rights under the Confrontation Clause.

¶31.    Montson argues that his Sixth Amendment right to confrontation was violated when the trial court permitted the admission of Linda's affidavit. Under the Confrontation Clause of the Sixth Amendment, if a witness is unavailable, the defendant must have had an opportunity to cross-examine that witness "where testimonial evidence is at issue." *Frazier v. State*, 907 So. 2d 985, 996 (¶38) (Miss. Ct. App. 2005). Accordingly, whether Montson's Sixth Amendment Confrontation right was violated depends upon whether Linda's affidavit was testimonial; and, if testimonial, whether Montson was afforded an opportunity to cross-examine her regarding the contents of the affidavit. *Id*.

¶32.    The United States Supreme Court provided solid examples of what constitutes testimonial hearsay in *Crawford v. Washington*, 541 U.S. 36, 68 (2004). For example, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . *police interrogations*" are all testimonial in nature. *Id*. at 68 (emphasis added). Additionally, the Court recognized a "core class of 'testimonial' statements." *Id*. at 51. This includes materials such as "*affidavits*, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[.]" *Id*. (emphasis added); *see also Armstead v. State*, 196 So. 3d 913, 917 (¶12) (Miss. 2016) (recognizing that affidavits are testimonial under the Confrontation Clause, pursuant to *Crawford*).

¶33.    Adding on to its holding in *Crawford*, the Supreme Court later defined the context of

10

testimonial statements. Specifically, statements are deemed testimonial if they are given under circumstances that "objectively indicate" that there is no "ongoing emergency" while the statement is given. *Davis v. Washington*, 547 U.S. 813, 823 (2006). Further, if the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," then the statement given in response to that interrogation is testimonial. *Id*.

¶34. Based on these bright-line definitions established in *Crawford* and *Davis*, Linda's affidavit is precisely testimonial hearsay. First, Linda became the subject of a police interrogation when she, while filing charges against her husband at a police station, was prompted on an intake form to "explain what happened." Second, she did not record the statements contained in the affidavit amid an ongoing emergency. In fact, each sentence was written in past-tense and recounted events that took place a few days before she filed her complaint.

¶35. Third, the affidavit is relevant to a later prosecution. After Linda filed the charges, a warrant was issued to compel Montson's appearance in court to answer the charges. JPD subsequently issued Linda a case information card, which Linda signed. The card specifically read, "[T]he possession of this card indicates that you have become a victim of *a criminal act*." (Emphasis added). This declaratory statement further confirms that "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 537 U.S. at 814. Accordingly, we hold that

11

Linda's affidavit is testimonial.[5]

¶36.   Furthermore, Montson was never able to cross-examine Linda concerning these testimonial statements.  To this point, the State argued in the trial court that Linda's affidavit should be admissible under the doctrine of "forfeiture by wrongdoing" because Montson was responsible for Linda's death, which is the reason he was unable to cross-examine her at trial. But "[i]n cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so *to prevent the witness from testifying*," unconfronted testimony is excluded.  *Giles v. California*, 554 U.S. 353, 361 (2008) (emphasis added).  Therefore a defendant only forfeits his rights under the Confrontation Clause if a witness was killed with the intent to prevent her from testifying at trial over the subject of the complaint.  *Id*.  For example, the forfeiture-by-wrongdoing doctrine would apply to Montson's trial facing the domestic violence allegations if he killed her to prevent her from testifying at that trial.

¶37.   Because Montson was unable to cross-examine Linda regarding the statements

---

[5] We do not need to specifically determine whether a hearsay exception applies.  For "there is scant evidence that [hearsay] exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case." *Crawford*, 541 U.S. at 56.  As articulated by *Crawford*:

> Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

*Id*. at n.7.

contained in her affidavit, and because he did not forfeit his constitutional right to cross-examine her, we hold that the admission of the affidavit violated Montson's Sixth Amendment right of confrontation.

¶38.     Notwithstanding this violation, we examine whether the violation is "harmless beyond a reasonable doubt." *Smith v. State*, 986 So. 2d 290, 300 (¶31) (Miss. 2008) (internal quotation mark omitted).  For "[a]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id*.

¶39.     Our state's Supreme Court squarely addressed whether a Confrontation violation was "harmless beyond a reasonable doubt" in *Corbin v. State*, 74 So. 3d 333, 338 (¶16) (Miss. 2011).  The *Corbin* Court considered factors such as "[1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, [5] the overall strength of the prosecution's case." *Id*. at 338-39 (¶16).

¶40.     In *Corbin*, the State introduced a recorded statement in which an unavailable witness accused the defendant of "purposefully or knowingly" committing the crime for which he stood trial. *Id*. at 339 (¶17).  The Court, finding that the statement's admission violated the Confrontation Clause, next determined whether the violation was harmless beyond a reasonable doubt. *Id*. at 338 (¶16).  The *Corbin* Court looked to the elements of the crime

13

and found that the recorded statement was the only piece of evidence the State possessed to support the defendant's conviction. *Id*. at 339 (¶17). In other words, not only was the evidence "vitally important" to the State's case, the testimony was not cumulative, there was no evidence corroborating the testimony on material points, cross-examination was not otherwise permitted, and the overall strength of the prosecution's case was weak. *Id*. Since none of factors had been met, the Court declined to find that the admission of the recorded statement was harmless beyond a reasonable doubt. *Id*.

¶41. We analyze each of these factors in turn as they relate to Montson's case. First, Linda's sworn statements were highly essential to the State's case because the affidavit as a whole helped to establish the premeditation necessary to convict Montson of first-degree murder. Second, the testimony was not cumulative. Aside from Stephon's testimony that Montson had generally threatened his mother in the past, the State offered no additional testimony to verify Montson's alleged threats or that he was "kicked out" of the bar because of his behavior toward Linda. No one from the bar testified to corroborate the affidavit and, outside of the affidavit itself, there was no evidence that the alleged events at The Green Room had ever occurred.

¶42. Finally, we look to the overall strength of the prosecution's case. First degree murder requires a showing that a defendant killed a person with "deliberate design." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2015). The statements contained in the affidavit were paramount evidence the State offered to prove this element. Indeed, the jury was able to conclude

Montson deliberately killed Linda when it read that he threatened to kill her only a few days before she was found dead of gunshot wounds. But this affidavit, related exclusively to the crucial element of "deliberate design," is inadmissible and unusable because it is wholly testimonial.[6]

¶43. Based on the factors set forth in *Corbin*, the violation of Montson's Confrontation rights was not harmless beyond a reasonable doubt.

¶44. Affidavits like Linda's are precisely the type of testimonial hearsay that the Confrontation Clause was designed to exclude. After its introduction into evidence, the State's witness read each statement contained within the affidavit word-for-word to the jury. Montson was never able to confront Linda about any of the very statements that the State repeatedly used to show that Montson "made good on his promise" to kill Linda. *See Sisk v. State*, 290 So. 2d 608, 611 (Miss. 1974) (finding that admission of an affidavit denied defendant the right to confront and cross-examine a witness). This is precisely what the Confrontation Clause was drafted and enacted to prevent. Accordingly, we reverse Montson's conviction and remand his case for a new trial.

## II. Detective Magee's testimony was inadmissible hearsay.

¶45. According to Montson, the trial court erred in allowing Detective Magee to testify

---

[6] We do not suggest that the State failed to furnish evidence outside of the affidavit. In fact, the State presented evidence that Linda was shot in the face and that boxes were packed at her apartment on the night of her death. But this evidence, along with the State's repeated declaration throughout trial that Montson "made good on his promise," intensifies the prejudicial effect of the affidavit by confirming its contents before the jury.

about the statements that Stephon, Marquis, and Christopher gave him at the crime scene.

¶46. Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c)(1)-(2). Stephon, Marquis, and Christopher provided their statements to Detective Magee, who then relayed their statements to the jury. But the State insists that the statements were not hearsay because they were simply offered to explain the course of the detective's investigation, not to prove the truth of the matter asserted.

¶47. Our Supreme Court has previously addressed this very issue. *Harrison v. State*, 722 So. 2d 681, 682 (Miss. 1998). In that case, the defendant stood trial for burglarizing a church. *Id*. at 682 (¶1). An officer testified that a few church members advised him that some items were missing from the church's auditorium. *Id*. at 683 (¶3). The defendant argued that the officer's testimony was "classic hearsay." *Id*. Conversely, the State insisted that the statements were safe under the umbrella of non-hearsay because they were offered only to show why the detective went into the auditorium, not for their truth. *Id*. at (¶5).

¶48. The Supreme Court held that the officer's testimony was hearsay and should have been excluded at trial. *Id*. at 684 (¶8). The Court rigidly emphasized that the State could have exercised a number of legitimate options to escape the claws of hearsay, such as allowing the officer to "[testify] to what he determined to be missing based on his first hand knowledge" or by simply putting the church members themselves on the stand to testify about the missing items. *Id*. The Court ultimately held that the State's route of introducing the

16

church member's statements was unacceptable and found that the statements were hearsay. *Id*.

¶49. In accordance with *Harrison*, we hold that Detective Magee's testimony was hearsay. Just as in that case, the State contends that the statements of Linda's family were only relayed through Detective Magee's testimony to explain the course of his investigation. Yet these statements went to the truth of the matter asserted—that Montson killed Linda with deliberate design rather than in self-defense. Just as in *Harrison*, if the State desired to introduce the testimony of Linda's family members, it could have done so by calling her sons as witnesses so they could testify to their personal experiences.

¶50. It is generally true "that admitting out-of-court statements made to the police during the course of their investigation is permissible." *Smith v. State*, 984 So. 2d 295, 303 (¶22) (Miss. Ct. App. 2007) (quoting *Gray v. State*, 931 So. 2d 295, 303 (¶22) (Miss. Ct. App. 2006)). But if an officer testifies about "how he received a complaint, and what he did about the complaint," he should do so "*without going into details of it.*" *Id*. (emphasis added).

¶51. Because we have concluded that Montson is entitled to a new trial, we do not reach the issue of whether this error, standing alone, would warrant reversal. It is enough to conclude that the State's introduction of Detective Magee's testimony is a prime example of "classic hearsay." *Harrison*, 722 So. 2d at 683 (¶3).

¶52. Because we find reversible error as to the Confrontation Clause violation, we also decline to address Montson's third issue on appeal.

17

**CONCLUSION**

¶53. Because Montson's Sixth Amendment Right to Confrontation was violated, and because this error was not harmless beyond a reasonable doubt, we hold that the trial court erred in allowing admission of Linda's affidavit into evidence. As a result, we reverse Montson's conviction and remand his case for a new trial.

¶54. **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS AND LAWRENCE, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**