# IN THE COURT OF APPEALS OF IOWA

No. 23-2085
Filed June 18, 2025

**STATE OF IOWA,**
         Plaintiff-Appellee,

**vs.**

**RICHARD LEE SHOGREN,**
         Defendant-Appellant.
_____

Appeal from the Iowa District Court for Marshall County, John Haney, Judge.

A criminal defendant appeals his convictions for domestic abuse assault and harassment. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Leah Patton (argued) of Patton Legal Services, LLC, Ames, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman (argued), Assistant Attorney General, for appellee.

Heard at oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**BULLER, Judge.**

"No face, no case." With that street-slang rhyme, Richard Shogren bragged to his mother in a recorded jail call about his plan to dissuade his girlfriend, S.J.O., from testifying against him in an upcoming domestic-abuse trial. S.J.O. ultimately recanted, but Marshall County jurors disbelieved S.J.O.'s recantation and instead credited her emotional description of Shogren threatening and assaulting her—as captured by a 911 call and a responding police officer's body camera. Shogren challenges evidentiary rulings, the sufficiency of the evidence, the colloquy for his stipulation to multiple previous domestic-abuse convictions, and the fine and surcharge. We affirm Shogren's convictions but, accepting the State's concessions on appeal, remand for additional proceedings on the sentence enhancement and fine issues.

## I.  Background Facts and Proceedings

In December of 2022, S.J.O. called 911 and, with tears in her voice, told the dispatcher: "I need officers . . . please, I've been abused . . . I was just kicked out of a car and almost ran over . . . ." Over the next four minutes, S.J.O. described how Shogren—who she described as her "ex-boyfriend"—hit her head against the car window, "choked"[1] her, and threatened to kill her and himself. With a wavering voice, she said near the end of the call: "I've never been so scared in my whole life."

---

[1] We use the word "choked" because that is the language S.J.O. used. However, we note the correct terminology would be "strangled" given S.J.O.'s description of the act. *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 11 (2019) (on how language matters and noting that describing acts of strangulation as "choking" can minimize or mitigate the perpetrator's actions).

A Marshalltown police officer responded to the gas station from which S.J.O. had called 911. She had to use the gas station phone because Shogren drove off with hers. The officer arrived "a couple minutes" after the 911 call and observed S.J.O. "was very emotional" and "crying." The officer also observed and documented with photographs that S.J.O. had "some blood on the edge of her mouth and some mild redness to her neck."

In a conversation recorded on the officer's body camera, S.J.O. again identified Shogren as her "ex-boyfriend" and described how he "started yelling" at her in the car, then "escalated" when he got mad about who she was talking to and demanded to see all of their text messages. S.J.O. said she tried to roll down her car window to yell for help, but Shogren rolled it back up and grabbed her seat belt. Then he started "choking" her with his hand around her neck, "bashed [her] head into the window," "yanked" her hair, and threatened to kill her and himself. The officer asked S.J.O. how she felt when she was being "choked," and she said she started getting lightheaded, had trouble breathing, and was scared. According to S.J.O., she jumped out of the car after Shogren attacked her, and that's when he "almost ran [her] over." She declined medical attention, explaining to police that she "just want[ed] to be safe." And the officer opined that the injuries he observed were consistent with the assault reported by S.J.O.

S.J.O. told the officer that she and Shogren had been dating for around a year but had broken up a couple weeks earlier after living together for a number of months. And she said that day "ain't the first time" Shogren had abused her, specifically citing an instance of abuse two weeks before.

Police tried to follow up with S.J.O. after their initial contact to gather more information and take updated photos of her injuries. Officers went to S.J.O.'s residence, but she wouldn't answer the door. And they called her cell phone, but she wouldn't return their calls.

In a recorded phone call between S.J.O. and Shogren before trial, he told her: "I'm so sorry for everything I did wrong." She told him she loved him, and he responded with the same. He told her that he wanted her to "prove [him] wrong," and she responded that she was "not going anywhere." And he raised his voice at her when he learned she registered for the jail-call system with her real name, exclaiming "they're gonna know" he and S.J.O. were in contact, which violated a no-contact order. Shogren told her: "You've gotta contact them. Call the police station. Get it dropped." He asked if she would "do that" for him, and she agreed. Then he said: "Ask them to drop all the charges. Say you lied or something, I don't care what." When S.J.O. expressed concern about getting "in trouble" for lying, Shogren yelled at her, said she wasn't "gonna get in trouble because [she] was a fucking white female," and told her to just "tell them."

In a different recorded jail call with his brother, Shogren remarked "hopefully she still knows what's up about depositions and all that" and "you know what I'm gettin' at." He told his brother: "Just tell her to help me," and his brother responded: "I will."

And in a third recorded jail call, this one with his mother, Shogren said: "I don't even expect to make it to trial, I'm hoping depositions will happen and hopefully she just doesn't show up." His mother remarked, "If that happens, then they don't have anything," and Shogren responded: "No face, no case."

By the time of depositions and then trial, S.J.O. had recanted. When the State called her as a witness at trial, it limited its questioning to the domestic relationship between her and Shogren. But she was then called by the defense: she testified she was under the influence of methamphetamine the day she called 911 and that she and Shogren had a verbal argument that never turned physical or violent. And she denied that Shogren had influenced her testimony or tried to do so, but she admitted that they had discussed the incident in the lead-up to trial. When asked by the prosecutor about specific acts of abuse and specific statements she made to police, S.J.O. repeatedly said she didn't remember. By the time of trial, she said Shogren was back to being her boyfriend and she loved him "very much." A police officer testified at trial that victims of domestic violence were "not always" cooperative with law enforcement, it was "not uncommon" for victims to decline further interviews or photographs, and they sometimes provided different information or recanted after the emergent situation had ended.

The jury found Shogren guilty of domestic abuse causing bodily injury—third or subsequent offense, a class "D" felony in violation of Iowa Code sections 708.1 and 708.2A(1) and (4) (2022); domestic abuse causing bodily injury, a serious misdemeanor in violation of sections 708.1 and 708.2A(1) and (2)[2]; and harassment in the first degree, an aggravated misdemeanor in violation of section 708.7(1) and (2). He was sentenced to concurrent prison sentences. And he appeals.

---

[2] The second domestic-abuse verdict was a lesser-included offense for domestic abuse assault by strangulation.

## II.    Discussion

Shogren challenges evidentiary errors related to the jail calls, the sufficiency of the evidence, the enhancement colloquy for the first domestic abuse count, and the fine and surcharge for the second count.  We address each contention separately, as they concern different standards of review.

### A.  Jail Calls

Shogren first contests the admission of his statements on the recorded jail calls, seemingly raising challenges under rules of evidence relating to hearsay, relevance, and unfair prejudice.[3]  *See* Iowa Rs. Evid. 5.401, 5.402, 5.403, 5.801.  To the extent the hearsay rules are implicated, we review for correction of errors at law.  *State v. Neitzel*, 801 N.W.2d 612, 621 (Iowa Ct. App. 2011).  Our review of evidentiary rulings is otherwise for abuse of discretion.  *See id.*

First, as to the hearsay question, we dispel some confusion that pervaded discussions in the district court and is reprised in Shogren's appellate brief and oral argument:  whether statements admitted under Iowa Rule of Evidence 5.801(d)(2) must actually be admissions against the declarant's interest.  This misunderstanding is so pervasive that Professor Emerita Laurie Doré addresses it in her book on evidence, noting the "confusing" terminology and how Iowa litigants sometimes "misleadingly" refer to this exception.  *See* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.801:9 (2024).  At least some of the confusion likely stems from the rule's historical title—"[a]dmission by party

---

[3] The State raises an error-preservation concern, noting the district court made express findings about some but arguably not all of the snippets of the calls played at trial.  Given our resolution of this issue, we elect to reach the merits.

opponent"; but in the modern restyling of the rules, this exemption from hearsay is more accurately titled "[a]n opposing party's statement." *Compare* Iowa R. Evid. 5.801(d)(2) (2009), *with* Iowa R. Evid. 5.801(d)(2) (2025). The plain text of the rule makes clear these statements need not actually be admissions or statements against interest; they just have to be statements (1) "offered against an opposing party" and (2) "made by the party in an individual or representative capacity." Iowa R. Evid. 5.801(d)(2)(A). So, in a criminal case, the State can always offer statements made by a defendant under this rule. With that backdrop, the portions of the jail calls admitted at trial were not hearsay as a matter of law: Shogren's statements are exempted from the rules against hearsay under Rule 5.801(d)(2)(A).[4] The district court correctly applied the law on hearsay.

Second, as to relevance, both the district court and the parties rely on our unpublished decision in *State v. Campbell*, No. 10-0117, 2013 WL 4011071 (Iowa Ct. App. Aug. 7, 2013). There, we affirmed that statements by a defendant attempting to "dissuade the victim from appearing in court" were relevant as evidence reflecting consciousness of guilt comparable to fabrication. *Campbell*, 2013 WL 4011071, at *6–7. So too here. Shogren's encouragement of S.J.O. to recant, conspiring with his brother to get S.J.O. to "help" him, and bragging to his mother about "no face, no case" all reflect consciousness of guilt and were

---

[4] It's not clear whether Shogren is also challenging admission of statements made by the listeners on the calls (S.J.O., his brother, his mother). To the extent he does, they were offered for their responsive context and not for the truth of any matter asserted. *See State v. Canady*, 4 N.W.3d 661, 668 (Iowa 2024) ("[The non-party caller's] statements also fell outside the hearsay rule. Most were not offered for the truth of the matter asserted."); *cf. State v. Enderle*, 745 N.W.2d 438, 443 (Iowa 2007) (recognizing courts hold police statements during interrogations of defendants admissible "to provide context for [the defendant's] responses").

admissible as substantive relevant evidence. *See State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Admissions may be implied by the conduct of the defendant subsequent to a crime when such conduct indicates a consciousness of guilt."). And beyond this purpose, we independently conclude the calls were relevant to show the relationship dynamics between Shogren and S.J.O. *Cf. State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004) ("[T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations."). The district court did not abuse its discretion in finding Shogren's statements relevant.

Third, as to Iowa Rule of Evidence 5.403, the parties point to another unpublished case to guide this analysis: *State v. Buchanan*, No. 17-0695, 2018 WL 3913671 (Iowa Ct. App. Aug. 15, 2018). There, we conducted a Rule 5.403 analysis of similar jail calls in which the defendant attempted to concoct an alibi defense and dissuade the victim from appearing at trial. *See Buchanan*, 2018 WL 3913671, at *10–11. We agreed that the statements on the calls were "prejudicial" in the sense that they were inculpatory, but they were not "unfairly prejudicial" and therefore the district court was not required to exclude them. *Id.* The same analysis applies here. Undoubtedly Shogren's statements were prejudicial in the sense they were inculpatory—that's why the State offered them. But we find they were not unfairly prejudicial. As part of this analysis, we note something the jury would not have known in listening to the calls at trial: only snippets were played. The State originally offered seven nearly-full-length recorded calls, which were winnowed through a combination of prosecutorial

discretion and the district court's ruling to clips of just three calls, each of limited duration—one about four minutes, and two around thirty seconds each. We need not repeat the particulars of the district court's lengthy analysis here, but we note the court excised what it perceived as the unfairly prejudicial portions of the calls, in which Shogren or a caller referred to extraneous information or other-bad-acts evidence. In our review, we find the district court conducted the appropriate balancing test in a thoughtful way, and we discern no abuse of discretion in the court admitting the most probative portions of Shogren's statements at trial. *See State v. Buman*, 955 N.W.2d 215, 221 (Iowa 2021) ("[W]e ordinarily defer to the district court in doing the balancing under Iowa Rule of Evidence 5.403.").

We single out one complaint in Shogren's brief for a little more discussion— his assertion that some of the inculpatory statements (particularly those made to his brother) "lacked proper context." We think this argument is a bit disingenuous. There was nothing preventing Shogren from exercising his right under Iowa Rule of Evidence 5.106 to have a broader context from the call played for the jury or from calling his mother or brother as witnesses to supply context at trial. We happen to have the full recordings available in the record before us, and we can see why Shogren's counsel chose not to make such a request: the surrounding context for the statement encouraging his brother to have S.J.O. "help" him with regard to depositions cast him in a decidedly negative light—to put it mildly. On that call, Shogren discussed his prior domestic-abuse convictions, how the current charge was a felony, how S.J.O. was "pretty smart" for blocking his calls from the jail and he wanted his brother to pass on a message that he "loved" her, and how he had been using drugs. The court's shortening of the calls and excision of certain

portions was overwhelmingly to Shogren's benefit, and he should not complain now about a ruling that benefited him below. And in much the same vein, we summarily reject the complaint in Shogren's brief that no cautionary instruction was given, since he never asked for one below and may well have believed it would draw unwanted attention to his (ultimately successful) witness tampering.

Last, we observe there is a lot of chatter in Shogren's brief and in the district court below about forfeiture by wrongdoing. *See generally Giles v. California*, 554 U.S. 353 (2008) (examining federal constitutional law when a defendant wrongfully causes the declarant's unavailability as a witness). We aren't entirely sure why. There is no Confrontation Clause issue when a party's own statements are offered against that party. *E.g.*, *Campbell*, 2013 WL 4011071, at *6. And to the extent this objection was intended to relate to S.J.O.'s statements, there is no Confrontation issue with regard to her statements because she testified at trial (for both sides, in fact) and was subject to cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). And even beyond these problems ruling out a Confrontation issue, we don't think recorded jail calls are generally testimonial. *Cf. id.* at 51–52 (identifying considerations for "testimonial" statements). From our perspective, the forfeiture-by-wrongdoing and Confrontation analysis was a red herring in this case below and remains so on appeal.

In sum, we see no error at law nor discern any abuse of discretion in how the district court handled the recorded jail calls.

**B. Sufficiency of the Evidence and *State v. Smith***

Shogren next challenges sufficiency of the evidence for his domestic-abuse and harassment convictions. We review for correction of errors at law. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Jones*, 967 N.W.2d at 339 (citation omitted).

For the domestic-abuse charges, Shogren concedes the domestic-relationship element, contesting only whether he assaulted S.J.O. His argument on appeal is about credibility, and he points to S.J.O. recanting and her trial testimony that she was under the influence when she made statements to the 911 dispatcher and police. But the jury reasonably could have credited S.J.O.'s earlier tearful statements about the assault rather than her subsequent recantation. And although corroboration is not necessary, S.J.O.'s statements the day of the assault were supported by the blood on her lip and red marks on her neck, which the officer opined were consistent with her report. We do not relitigate credibility on appeal, and Shogren's claim supplies no basis for relief. *Cf. State v. Hernandez*, 20 N.W.3d 502, 507–08 (Iowa Ct. App. 2025) ("A criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him instead of the victim.").

Shogren's challenge to the harassment conviction meets a similar fate. S.J.O. told police and the 911 dispatcher that Shogren threatened to kill her, and the jury was free to credit that statement rather than her recantation at trial. That Shogren wishes the jury had believed different evidence is not a valid rationale for appellate relief. *See id.*

In his reply brief, Shogren argues we should order judgment of acquittal based on our long-criticized and divided panel decision in *State v. Smith*, 508 N.W.2d 101 (Iowa Ct. App. 1993). We are not persuaded. Assuming without deciding there is anything left of *Smith* after it has been repeatedly disapproved of by our supreme court and this court,[5] we find it inapplicable here—just as we have in every other case since *Smith* was decided. We have carefully reviewed the 911 call and body-cam footage, and we have little trouble concluding a reasonable jury could have found those statements established the elements of the offenses and were more credible than the recantation that followed a rekindling of the

---

[5] As the supreme court has explained,

> *Smith* is an outlier case. It has been criticized in the commentary, and it has not been followed in any sexual abuse case in Iowa since. The primary flaw in *Smith* is that it is inconsistent with the standard of appellate review of jury verdicts, which requires that the evidence be viewed in the light most favorable to the verdict and which requires deference to the jury's resolution of disputed factual issues.

*State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022); *see also State v. Trane*, 984 N.W.2d 429, 437 (Iowa 2023) (declining to follow *Smith* and calling it "inconsistent with our appellate standard"); *State v. Showers*, No. 23-0390, 2024 WL 2317709, at *5 & n.4 (Iowa Ct. App. May 22, 2024) (collecting a wide array of voices from our court criticizing *Smith*). For its part, the State's brief colorfully posits that *Smith* "seemingly hangs on only by the thread of tradition." And in oral argument, the State stressed that *Smith* cannot be good law in this context because the opinion weighed the credibility of the evidence like a motion for new trial rather than deciding sufficiency like a motion for judgment of acquittal. *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998) (on the difference between the two).

relationship between S.J.O. and Shogren. Shogren's statements on the recorded calls supply a believable explanation for S.J.O.'s changing story. And there was nothing about S.J.O.'s statements to 911 or the police that we found so absurd or unbelievable it precluded conviction (again assuming without deciding we have the power to set aside a verdict on that basis). We decline to disturb the jury's verdict here, under *Smith* or any other case law.

### C. Sentencing-Enhancement Colloquy

Shogren next argues the district court's colloquy with him about his prior convictions was insufficient under *State v. Harrington*, 893 N.W.2d 36, 45–47 (Iowa 2017), and related cases. *See also* Iowa R. Crim. P. 2.19(8)(a). The State concedes the colloquy was inadequate because Shogren was not informed that there would be no trial on this issue. We accept this concession given the record made below. And we note we can reach this issue because Shogren was not advised of the need to file a motion in arrest of judgment. *State v. Smith*, 924 N.W.2d 846, 851 (Iowa 2019). We therefore vacate the enhanced sentence imposed on count one and remand for either a proper stipulation colloquy or trial on the enhancement, followed by re-sentencing on count one if the enhancement is proven. *See State v. Coleman*, 907 N.W.2d 124, 148 (Iowa 2018). We do not disturb the prison sentences on counts two and three.

### D. Fine and Surcharge

Last, Shogren contends that the district court erroneously suspended the fine and surcharge on count two. The State concedes error and suggests we remand with directions for the district court to impose the fine. *See* Iowa Code § 903.1(1) (prohibiting the court from suspending the fine for a simple or serious

misdemeanor); *State v. Abbott*, No. 17-1337, 2018 WL 1433807, at *2 (Iowa Ct. App. Mar. 21, 2018). We agree and so order, noting the surcharge must necessarily be imposed as well. *See* Iowa Code § 903.1(4).

### III.     Disposition

We affirm Shogren's convictions. We vacate the enhancement on count one and remand for either a new stipulation colloquy or trial on the prior convictions. We also vacate the imposition of the suspended fine imposed on count two and remand with directions to impose the fine and appropriate surcharge. At re-sentencing, the court should impose sentence on count one if the enhancement is proven and issue a corrected sentencing order addressing the fine and surcharge on count two. We do not disturb the prison sentences on counts two and three.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**